## UNITED STATES COURT OF INTERNATIONAL TRADE

**DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC.,**

        **Plaintiffs,**

   **v.**

**UNITED STATES,**

        **Defendant,**

   **and**

**INSTEEL WIRE PRODUCTS COMPANY, SUMIDEN WIRE PRODUCTS CORPORATION, AND WIRE MESH CORP.,**

        **Defendant-Intervenors.**

**Before: Joseph A. Laroski, Jr., Judge**
**Court No. 24-00212**

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD SUBMITTED ON BEHALF OF DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC.

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Deacero S.A.P.I. de C.V. and Deacero USA, Inc. (collectively, "Deacero" or "Plaintiffs") respectfully move for judgment on the administrative record on the issues raised in their Complaint challenging the U.S. Department of Commerce's ("Commerce") final determination in the circumvention inquiry pursuant to the antidumping duty order on prestressed concrete steel wire strand from Mexico, concerning imports of certain high carbon steel wire from Mexico. *See Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 89 Fed. Reg. 79,252 (Dep't Commerce Sept. 27, 2024), and accompanying Issues and Decision Memorandum ("*Final Determination*"), as

amended by *Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order; Correction*, 89 Fed. Reg. 85,844 (Dep't Commerce Oct. 29, 2024) ("*Amended Final Determination*").

For the reasons set forth in the accompanying memorandum, Commerce's *Final Determination* is unreasonable, unsupported by substantial evidence on the record, and otherwise not in accordance with law.  Accordingly, Deacero respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court; and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Jacob A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr
  LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for Deacero S.A.P.I. de C.V. and Deacero USA, Inc.*

Dated: May 19, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

**DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC.,**

           **Plaintiffs,**

    **v.**

**UNITED STATES,**

           **Defendant,**

    **and**

**INSTEEL WIRE PRODUCTS COMPANY, SUMIDEN WIRE PRODUCTS CORPORATION, AND WIRE MESH CORP.,**

           **Defendant-Intervenors.**

**Before: Joseph A. Laroski, Jr., Judge**
**Court No. 24-00212**

### ORDER

Upon consideration of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiffs' motion is granted; it is further

**ORDERED** that the final determination of the U.S. Department of Commerce ("Commerce") in *Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 89 Fed. Reg. 79,252 (Dep't Commerce Sept. 27, 2024), and accompanying Issues and Decision Memorandum ("*Final Determination*"), as amended by *Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order; Correction*, 89 Fed. Reg. 85,844 (Dep't Commerce Oct. 29, 2024), is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

**SO ORDERED.**

_____

Hon. Joseph A. Laroski, Jr., Judge

Dated: _____
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC.,

        Plaintiffs,

    v.

UNITED STATES,

        Defendant,

    and

INSTEEL WIRE PRODUCTS COMPANY, SUMIDEN WIRE PRODUCTS CORPORATION, AND WIRE MESH CORP.,

        Defendant-Intervenors.

Before: Joseph A. Laroski, Jr., Judge
Court No. 24-00212

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed From Pages 2-3, 9-10, 16-17, 29, 31-41

---

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF DEACERO'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

David J. Ross
Stephanie E. Hartmann
Jacob A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for Deacero S.A.P.I. de C.V. and Deacero USA, Inc.*

Dated: May 19, 2025

**Court No. 24-00212**                                          NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

RULE 56.2 STATEMENT ................................................................................................... 4

    I.   Administrative Decision Under Review ...................................................................... 4

    II.  Issues Presented and Summary of Arguments ........................................................... 4

STATEMENT OF FACTS .................................................................................................. 6

    I.   The Preliminary Phase of Commerce's Circumvention Inquiry ............................... 6

    II.  Commerce's Preliminary Determination .................................................................. 7

    III. Commerce's Final Determination ............................................................................. 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT ..................................................................................................................... 11

    I.   Commerce's Comparison of Deacero's U.S. Production Process for PC
        Strand to a PC Strand Production Process Starting with Raw Materials Is
        Unlawful .................................................................................................................. 11

           A.   Commerce's Determination is Contrary to the Text, Structure, History,
               and Purpose of Section 781(a) and Thus Unlawful ................................. 13

           B.   Commerce's Determination is Contrary to CIT and Federal Circuit
               Case Law ................................................................................................... 18

           C.   Commerce's Determination Deviates From Its Prior Practice and Is
               Thus Arbitrary and Capricious .................................................................. 21

           D.   Commerce's Determination is Unsupported by Substantial Record
               Evidence .................................................................................................... 26

    II.  Commerce's Determination That Deacero's PC Strand Production Process in
        the United States is Minor or Insignificant is Unreasonable, Unsupported by
        Substantial Evidence, and Unlawful ....................................................................... 30

           A.   Commerce's Determination That Deacero's U.S. Investment Is Minor
               Is Unsupported by Substantial Record Evidence ...................................... 30

           B.   Commerce's Determination That Deacero's Level of R&D in the
               United States Is Minor Is Unsupported by Substantial Record
               Evidence .................................................................................................... 31

           C.   Commerce's Determination That the Nature of Deacero's Production
               Process in the United States Is Minor Is Unsupported by Substantial
               Record Evidence ....................................................................................... 32

           D.   Commerce's Determination That the Extent of Deacero's Production
               Facilities in the United States Is Minor Is Unsupported by Substantial
               Record Evidence ....................................................................................... 35

**Court No. 24-00212**                                      **NON-CONFIDENTIAL VERSION**

    E.    Commerce's Determination That Value of Processing Performed in the United States Accounts for a Small Proportion of the Value of PC Strand Is Unsupported by Substantial Record Evidence ........................................ 36

III. Commerce's Evaluation of Deacero's Imports Fails to Consider Evidence Concerning the Pattern of Trade and Is Thus Unlawful ...................................................37

CONCLUSION........................................................................................................................... 42

# **TABLE OF AUTHORITIES**

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................10

19 U.S.C. § 1677j(a)(1)(C), (D)..............................................................8, 11, 14

19 U.S.C. § 1677j(a)(2), (C)..................................................................8, 14, 29

19 U.S.C. § 1677j(a)(3)(A), (C)..................................................................36, 40

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345 (CIT 2002).........................10

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021), *aff'd*, 65 F. 4th 1351 (Fed. Cir. 2023) ....................................................19, 39, 40

*Bio-Lab, Inc. v. United States*, No. 24-00024, 2025 WL 1099710 (CIT 2025).......................10, 11

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................10

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ...........................................10

*Delverde, SrL. v. United States*, 202 F.3d 1360 (Fed. Cir. 2000)................................................10

*Jiaxing Brother Fastener Co. v. United States*, 380 F.Supp.3d 1343 (CIT 2019).............20, 23, 25

*Lingyi Chengen Imp. and Exp. Co. v. United States*, 391 F. Supp. 3d 1283 .................................36

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................10

*Macao Commer. & Indus. Spring Mattress Mfr. v. United States*, 437 F. Supp. 3d 1324 (CIT 2020) ........................................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................................................................................10, 20, 37

*Rust v. Sullivan*, 500 U.S. 173, 187 (1991) .................................................................................20

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................10

Court No. 24-00212

NON-CONFIDENTIAL VERSION

**Administrative Determinations**

*Antidumping Duty Order on Prestressed Concrete Steel Wire Strand From
    Mexico: Preliminary Affirmative Determination of Circumvention*, 89 Fed.
    Reg. 22,668 (Dep't Commerce Apr. 2, 2024) and accompanying
    Preliminary Decision Memorandum.......................................................................... *passim*

*Anticircumvention Inquiry on Uncovered Innerspring Units from the People's
    Republic of China*: Macao Commercial Preliminary Analysis
    Memorandum.......................................................................................................19

*Certain Corrosion-Resistant Steel Products from the People's Republic of China:
    Affirmative Final Determination of Circumvention Involving the United
    Arab Emirates*, 85 Fed. Reg. 41,957 (July 13, 2020) ...................................20, 25

*Certain Corrosion-Resistant Steel Products from the People's Republic of China:
    Affirmative Preliminary Determination of Circumvention Involving the
    United Arab Emirates*, 85 Fed. Reg. 8,841 (Feb. 18, 2020) and
    accompanying Preliminary Decision Memorandum ...................................19, 24

*Certain Hardwood Plywood Products from the People's Republic of China: Final
    Scope Determination and Affirmative Final Determination of
    Circumvention of the Antidumping and Countervailing Duty Orders*, 88
    Fed. Reg. 46740 (July 20, 2023) and accompanying Issues and Decision
    Memorandum.......................................................................................................24

*Certain Internal-Combustion, Industrial Forklift Trucks From Japan; Negative
    Preliminary Determination of Circumvention of Antidumping Duty Order*,
    54 Fed. Reg. 50,260, 50,262 (Dep't Commerce Dec. 5, 1989).........................22

*Certain Uncoated Paper from Brazil: Affirmative Preliminary Determination of
    Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls*,
    86 Fed. Reg. 7,261 (Dep't Commerce Jan. 27, 2021), and accompanying
    Preliminary Decision Memorandum................................................................21

*Certain Uncoated Paper from Indonesia: Affirmative Preliminary Determinations
    of Circumvention of the Antidumping and Countervailing Duty Orders for
    Uncoated Paper Rolls*, 86 Fed. Reg. 7,266 (Dep't Commerce Jan. 27,
    2021) ...................................................................................................................21

*Certain Uncoated Paper from the People's Republic of China: Affirmative
    Preliminary Determinations of Circumvention of the Antidumping and
    Countervailing Duty Orders for Uncoated Paper Rolls*, 85 Fed. Reg.
    72,624 (Dep't Commerce Nov. 13, 2020) .......................................................21

NON-CONFIDENTIAL VERSION

Court No. 24-00212

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,
from the Republic of China: Final Scope Determination and Final
Affirmative Determinations of Circumvention With Respect to Cambodia,
Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce
Aug. 23, 2023) and accompanying IDM with respect to the Kingdom of
Thailand ...........................................................................................................14

*Ferrovanadium and Nitrided Vanadium From the Russian Federation: Negative
Final Determination of Circumvention of the Antidumping Duty Order*, 77
Fed. Reg. 46,712 (Dep't Commerce Aug. 6, 2012), and accompanying
Issues and Decision Memorandum ...................................................................22

*Hot-Rolled Lead and Bismuth Carbon Steel Products From Germany and the
United Kingdom; Negative Preliminary Determinations of Circumvention
of Antidumping and Countervailing Duty Orders*, 63 Fed. Reg. 24,156,
24,158 (Dep't Commerce May 1, 1998) ...................................................... 22-23

*Notice of Final Determination of Sales at Less Than Fair Value and Negative
Final Determination of Critical Circumstances: Prestressed Concrete
Steel Wire Strand from Mexico*, 68 Fed. Reg. 68,350 (Dec. 8, 2003), and
accompanying Issues and Decision Memorandum ....................................26, 28

*Notice of Initiation of antidumping duty investigations: Prestressed Concrete
Steel Wire Strand From Brazil, India, the Republic of Korea, Mexico, and
Thailand*, 68 Fed. Reg. 9,050 (Dep't Commerce Feb. 27, 2003) .....................27

*Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary
Determination of Circumvention of the Antidumping Duty Order*, 79 Fed.
Reg. 31302 (June 2, 2014) and accompanying Preliminary Decision
Memorandum.....................................................................................................24

*Preliminary Negative Determination and Extension of Time Limit for Final
Determination of Circumvention of the Antidumping Duty Order on
Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77
Fed. Reg. 6,537, 6,541 (Dep't Commerce Feb. 8, 2012).................................22

*Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative
Determination of Circumvention of the Antidumping Duty Order*, 89 Fed.
Reg. 79,252 (Dep't Commerce Sept. 27, 2024) and accompanying Issues
and Decision Memorandum........................................................................ *passim*

*Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative
Determination of Circumvention of the Antidumping Duty Order;
Correction*, 89 Fed. Reg. 85,844 (Dep't Commerce Oct. 29, 2024) ..................4

*Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 Fed. Reg. 33405, 33412-13 (June 6, 2012)................................................................24

*Uncovered Innerspring Units from the People's Republic of China*, 83 Fed. Reg. 42,254 (Dep't of Commerce Aug. 21, 2018) and accompanying Preliminary Decision Memorandum......................................................................18

**ITC Determinations**

*Certain Corrosion-Resistant Steel Products from China, Italy, India, Korea, and Taiwan*, Investigation Nos. 701-TA-534-537 and 731-TA-1274-1278 (Final), ITC Pub. No. 4620 (2016) ............................................................20, 25

*Prestressed Concrete Steel Wire Strand From Argentina, Colombia, Egypt, Indonesia, Italy, Malaysia, Netherlands, Saudi Arabia, South Africa, Spain, Taiwan, Tunisia, Turkey, Ukraine, and United Arab Emirates*, Inv. No. 701-TA-646 and 731-TA-1502- 1516 (Preliminary), USITC Pub. No. 5062 (June 2020) ...............................................................................27

*Prestressed Concrete Steel Wire Strand from Brazil, India, Japan, Korea, Mexico, and Thailand*, Inv. Nos. 701-TA-432 and 731-TA-1024-1028 and AA1921-188 USITC Pub. No. 5130 (Oct. 2020) ........................................17, 25

*Prestressed Concrete Steel Wire Strand from Brazil, India, Korea, Mexico, and Thailand*, Inv. Nos. 701-TA-432 and 731-TA-1024-1028, USITC Pub. No. 3589 (Mar. 2003) ...........................................................................28

*Prestressed Concrete Steel Wire Strand from Brazil, India, Korea, Mexico, and Thailand*, Inv. No. 701-TA-432 and 731-TA-1024-1028 (Final), USITC Pub. No. 3663 (Jan. 2004) ..............................................................27, 28

*Prestressed Concrete Steel Wire Strand From Brazil*, Inv. No. 701-TA-152 (Final), USITC Pub. 1325 (Mar. 1983) .............................................................27

*Prestressed Concrete Steel Rail Tie Wire from China and Mexico*, Inv. No. 731-TA-1207-1208 (Final), USITC Pub. No. 4473 (June 2014) ..............................27

*Prestressed Concrete Steel Wire Strand From China*, Inv. No. 701-TA-464 and 731-TA-1160 (Final), USITC Pub. No. 4162 (June 2010) ..............................27

*Prestressed Concrete Steel Wire Strand From France*, Inv. No. 701-TA-153 (Final), USITC Pub. 1325 (Dec. 1982) .............................................................27

*Prestressed Concrete Steel Wire Strand From Spain*, Inv. No. 701-TA-164 (Final), USITC Pub. No. 1281 (May 1984) ......................................................27

*Prestressed Concrete Steel Wire Strand From The United Kingdom*, Inv. Nos.
701-TA-89 (Final), USITC Pub. 1343 (Dec. 1982) .......................................................27

**Legislative Materials**

S. Rept. 103-412 ........................................................................................................14

Statement of Administrative Action accompanying the Uruguay Round
Agreements Act, H.R. Doc. No. 316, 103rd Cong., 2d Sess., vol. 1 .........................14, 16

**NON-CONFIDENTIAL VERSION**

## INTRODUCTION

On behalf of Plaintiffs Deacero S.A.P.I. de C.V. and Deacero USA, Inc. (collectively, "Deacero"), we submit this brief in support of Deacero's Rule 56.2 motion for judgment on the agency record.

The agency determination at issue in this case – namely, the Department of Commerce's ("Commerce") conclusion that Deacero is circumventing the antidumping duty order on prestressed concrete steel wire strand ("PC strand") with imports of high-carbon steel ("HCS") wire from Mexico because Deacero's process to produce PC strand in the United States from such wire is "minor or insignificant" within the meaning of section 781(a) of the Tariff Act of 1930 (the "Act") – is deeply flawed.  It is flawed because the Department conducted its analysis by unlawfully comparing Deacero's U.S. production process for PC strand to a hypothetical "complete production process" extending all the way back to primary iron and steel inputs (*i.e.*, steel billet and scrap).  This methodology finds no support in the text of section 781(a), its legislative history, or industrial reality.  In fact, the record evidence, which is composed of authoritative ITC and Commerce definitions of the manufacturing process, which in turn is based on statements from the Defendant-Intervenors themselves, shows that the production process for PC strand begins with wire rod, not steel billet or scrap.  Commerce's methodology is unlawful, and its conclusion is unsupported by substantial record evidence.

Commerce's flawed methodology has significant negative implications for the administration of AD/CVD orders and steel industry investment in the United States.  By including within the scope of its comparison the cost of producing primary iron and steel inputs (*i.e.*, steel billet and scrap), Commerce effectively expands the scope of orders on downstream steel products to include all imported intermediate steel products.  Commerce's methodology has

this result because the scale of investment in the United States for any given downstream steel product will rarely be comparable to the cost of a process that includes the investment value of a steel mill that produces the primary iron or steel inputs – or, indeed, the value of a mining operation, including potentially the value of acquiring the land-use rights for a mine. This sweeping result is contrary to the clear meaning of the statute and congressional intent and would have dire consequences for investment in the United States.

This erroneous methodology infects Commerce's analysis of each of the five factors underlying its determination that Deacero's PC strand production process in the United States is "minor or insignificant." For example, Commerce unreasonably concludes that the nature of Deacero's production process in the United States is minor because it does not make HCS wire from wire rod or the wire rod from primary iron and steel inputs in the United States. By this faulty reasoning, the only way to avoid being swept into the Order on PC strand is to produce it from primary steel inputs (*i.e.*, steel billet or scrap) in the United States. However, **[**

**]** domestic producers of PC strand who requested this inquiry, **[**


**]**. Moreover, Commerce inconsistently evaluates the five factors – in some cases, evaluating them based on a relative basis in comparison to a hypothetical "complete production process" in Mexico, whereas in others (namely, Deacero's level of R&D in the United States), it does so on an absolute basis, without explanation. For these reasons, Commerce's determination that Deacero's U.S. production processes are minor or insignificant, is unreasonable, unsupported by substantial evidence, and unlawful.

Finally, in evaluating the pattern of trade, Commerce arbitrarily defined the inquiry and comparison periods for considering Deacero's imports based entirely on the Defendant-

2

Intervenors' results-driven proposal.  This self-serving timeframe was guaranteed to show an

increase in imports because it failed to account for the cessation and resumption of Deacero's PC

strand production in the United States **[**

                                    **].**  As Deacero explained to Commerce throughout these

proceedings, Deacero began producing PC strand in the United States in 2010, and it

continuously imported HCS wire from Mexico during this time.  However, **[**




                                    **].**  Thus, what Commerce purports to be an

"increase" in imports is, in fact, a resumption of the normal pattern of trade from a temporary

production hiatus.

        Commerce summarily dismissed this evidence as irrelevant and, in so doing, rendered its

determination unsupported by substantial evidence.  Deacero's status as a previous U.S. producer

of PC strand **[**                                                    **]** is highly material to

Commerce's evaluation of the pattern of trade and sourcing patterns: a long-standing U.S.

producer that has consistently sourced from Mexico throughout the history of the order is clearly

in a different position with respect to a circumvention inquiry than, say, a foreign producer with

no history of U.S. production who sets up "screwdriver assembly operations" in the United

States with the purpose of circumventing an order.

        Commerce's determination is unlawful and unsupported by substantial evidence.  The

Court should remand to Commerce, so that Commerce can issue a determination consistent with

the Court's opinion.

**Court No. 24-00212**

# RULE 56.2 STATEMENT

## I.    Administrative Decision Under Review

Deacero challenges certain aspects of the final determination of the U.S. Department of Commerce ("Commerce") in the circumvention inquiry pursuant to the antidumping duty order on prestressed concrete steel wire strand from Mexico, concerning imports of certain high carbon steel wire from Mexico. *See Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 89 Fed. Reg. 79,252 (Dep't Commerce Sept. 27, 2024) ("*Final Determination*"), P.R. 156, ECF No. 20-1, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 155, ECF No. 20-2, as amended by *Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order; Correction*, 89 Fed. Reg. 85,844 (Dep't Commerce Oct. 29, 2024) ("*Amended Final Determination*"), P.R. 159.

The *Final Determination* is dated September 20, 2024, and was published in the Federal Register on September 27, 2024. *See Final Determination*. The *Amended Final Determination* is dated October 23, 2024, and was published in the Federal Register on October 29, 2024. *See Amended Final Determination*.

## II.    Issues Presented and Summary of Arguments

1.    **Whether Commerce's comparison of Deacero's U.S. production process for PC strand to a hypothetical PC strand production process starting with primary iron and steel inputs (*i.e.*, steel billet and scrap) is unlawful.**

Yes. Commerce's methodology, which relies upon a definition of the "entire manufacturing process" as extending back to "primary iron and steel inputs" finds no support in the text, structure, legislative history, or purpose of section 781(a) and is thus unlawful. Moreover, Commerce's determination is unsupported by substantial evidence because the record

shows that Deacero's (and, indeed, the Defendant-Intervenors') "entire manufacturing process" to produce PC strand in fact starts with wire rod, not scrap or steel billets, and is consistent with the ITC's description of the production process.

> **2.** **Whether Commerce's conclusion that Deacero's U.S. production processes are "minor or insignificant" is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

Yes. In evaluating each of the five factors, Commerce ignored substantial record evidence to erroneously conclude that Deacero's PC strand production processes in the United States are "minor or insignificant" within the meaning of section 781(a). In fact, substantial record evidence indicates that Deacero has invested significant sums in operations directly related to its PC strand operations; has R&D expenditures in the United States on par with those in its Mexican facilities; performs three of the four standard PC strand production steps in the United States – much like the Defendant-Intervenors, and as defined by the ITC; has extensive and sophisticated facilities in the United States; and that the value of the processing performed in the United States accounts for a significant portion of the value of the PC strand sold in the United States. Accordingly, Commerce's determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

> **3.** **Whether Commerce's analysis of Deacero's imports in considering the overall pattern of trade is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.**

Yes. Commerce arbitrarily defined the inquiry and comparison periods in a manner that ignores substantial record evidence concerning Deacero's status as a long-standing U.S. producer of PC strand that has consistently sourced from Mexico throughout the history of the Orders.

Commerce's determination is thus arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.[1]

## III.    Request for Court Order and Relief Sought

Plaintiffs respectfully request that the Court hold that the *Final Determination* is unreasonable, unsupported by substantial evidence, and is otherwise not in accordance with law. Plaintiffs request that the Court remand the *Final Determination* for disposition in accordance with the Court's final opinion and grant such other relief as the Court may deem just and proper.

## STATEMENT OF FACTS

## I.    The Preliminary Phase of Commerce's Circumvention Inquiry

On June 9, 2023, Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corp. filed a circumvention inquiry request alleging that imports of HCS wire from Mexico and further processed into PC strand in the United States are circumventing the antidumping duty order on PC strand from Mexico.  *See* Petitioners' Letter, Petitioners' Request for Circumvention Ruling Pursuant to Section 781(a), as Amended, (June 9, 2023), P.R. 1, C.R. 1 ("Petitioners' Ruling Request").  The request defined the inquiry merchandise as HCS wire with a carbon content between 0.78-0.85 percent and a diameter of less than 4.50 millimeters. *Id.* at 17.  Commerce initiated a country-wide circumvention inquiry on July 31, 2023.  *See Prestressed Concrete Steel Wire Strand From Mexico: Initiation of Circumvention Inquiry on the Antidumping Duty Order*, 88 Fed. Reg. 49,438 (Dep't Commerce July 31, 2023), P.R. 13.

---

[1] Deacero notes that its Complaint also set forth counts alleging that Commerce unlawfully (1) expanded the scope of the Order to include a product that was excluded from the original investigation; (2) expanded the scope of the Order to include raw materials that are not "parts or components" within the meaning of section 781(a); and (3) expanded the circumvention inquiry while it was underway by changing the definition of inquiry merchandise. Deacero has elected not to pursue these claims in this litigation.

Court No. 24-00212

Commerce's initiation notice identified the inquiry merchandise as defined in the Petitioners'

circumvention request. *Id.* at 49,439.

## II.    Commerce's Preliminary Determination

Commerce published its preliminary determination on April 2, 2024. *See Antidumping*

*Duty Order on Prestressed Concrete Steel Wire Strand From Mexico: Preliminary Affirmative*

*Determination of Circumvention*, 89 Fed. Reg. 22,668 (Dep't Commerce Apr. 2, 2024), P.R.

122, and accompanying Preliminary Decision Memorandum ("PDM"), P.R. 120; *see also*

Department Memorandum, Prestressed Concrete Steel Wire Strand from Mexico –

Circumvention Inquiry: Preliminary Analysis Memorandum for Deacero (Mar. 26, 2024), P.R.

121, C.R. 183 ("Prelim. Analysis Memo"). Commerce stated that section 781(a) provides

authority to expand the scope of an antidumping duty order to include "parts and components" if,

among other things, "the process of assembly or completion in the United States is minor or

insignificant." PDM at 8. Commerce preliminarily found that Deacero's process to produce PC

strand in the United States from HCS wire imported from Mexico is "minor or insignificant" as

compared to a production process starting with primary iron and steel inputs, namely steel billets.

*See id.* at 8-18.

Commerce also stated that section 781(a) of the Act allows Commerce to include parts or

components within the scope of an order if the value of the parts or components produced in the

foreign country to which the antidumping duty order applies is a significant portion of the total

value of the merchandise sold in the United States. *Id.* at 18. Commerce preliminarily found

that the value of the HCS wire that Deacero imports from Mexico is a significant portion of the

total value of its PC strand sold in the United States. *Id.* at 18. Commerce based its analysis on a

constructed cost buildup for HCS wire calculated using Deacero's reported costs of production in Mexico.[2]  *Id.*

Finally, Commerce stated that section 781(a) of the Act directs Commerce to consider additional factors, including the pattern of trade.  *Id.* at 18-19.  Commerce preliminarily found that Deacero's pattern of trade for the period January 2019 through December 2020 as compared to the inquiry period of January 2021 through December 2022 weighed in favor of finding circumvention.  *Id.* at 19.

In its case brief before Commerce, Deacero argued that its PC strand production process in the United States is not "minor or insignificant."  Deacero Brief, Prestressed Concrete Steel Wire Strand From Mexico: Deacero's Case Brief (June 14, 2024) at 9-20, P.R. 148, C.R. 190 ("Deacero Case Brief").  Deacero argued that Commerce should assess Deacero's U.S. production process relative to its process of producing PC strand in Mexico, not by reference to a production process that begins with primary iron and steel inputs (*i.e.*, steel billets or scrap).  *Id.* at 9-15.  Deacero also argued that the five factors listed in 19 U.S.C. § 1677j(a)(2) supported a negative determination.  *Id.* at 15-20.

With respect to the fifth factor ("whether the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States," 19 U.S.C. § 1677j(a)(2)(E)) and whether the value of Deacero's imported HCS wire is a significant portion of the total value of PC strand, 19 U.S.C. § 1677j(a)(1)(D), Deacero argued that Commerce erred in calculating a CV for the HCS wire that Deacero produces in Mexico,

---

[2] Commerce disputed that it used Constructed Value ("CV") as the term is defined in the statute because the CV methodology includes a profit component.  *See* IDM at 20.

instead of the actual value for the product as reflected in Deacero's customs documentation. *Id.*
at 19-22.

Deacero also argued that Commerce should make a negative determination because the
pattern of trade does not support a finding of circumvention. *Id.* at 22-24. Deacero pointed to
record evidence showing that it ceased producing PC strand in the United States in 2015 **[**

**]**. Deacero further noted that, following the conclusion of the **[**

**]**. Deacero argued that it was this **[**                                      **]** that accounted
for a relative increase in imports of HCS wire during the inquiry period (January 2021 to June
2023) as compared to the comparison period (July 2018 to December 2020), which was
unrelated to circumvention. *See id.*

## III.    Commerce's Final Determination

Commerce published the final determination on September 20, 2024. *See Final
Determination* and accompanying IDM. Commerce made no changes to its preliminary findings
that Deacero's U.S. production process is "minor or insignificant"; that the value of Deacero's
HCS wire imported from Mexico is a significant portion of the total value of its PC strand sold in
the United States; and that Deacero's pattern of imports of HCS wire support an affirmative
circumvention determination. *See id.* at 12-25. In evaluating whether Deacero's U.S. production
process is "minor or insignificant," Commerce continued to compare Deacero's U.S. production
process to what it characterized as the "full" production process for PC strand in Mexico, based
on the assumption that "Deacero uses a vertically integrated production process by producing PC
strand from primary iron and steel inputs itself in Mexico" (*i.e.*, steel billets and scrap). *Id.* at

14-15. Commerce stated that its consistent practice has been to rely on the "complete" production process for circumvention analyses under both section 781(a) and 781(b) of the Act, and that the ITC's description of the manufacturing process is not dispositive. *Id.* at 13.

Commerce also maintained that its reliance on a constructed cost buildup rather than Deacero's actual reported sales values for imported HCS wire was within its authority under section 781(a)(1)(D) and its regulations, and that the constructed cost buildup was purportedly more accurate than Deacero's reported sales values. *Id.* at 22. Commerce also continued to find that the pattern of trade supports an affirmative determination, because Deacero's imports increased in the inquiry period compared to the prior 30 months. *Id.* at 23-25. Commerce stated that Deacero failed to explain how the [

], would affect Commerce's conclusion that the increase in imports supports an affirmative determination. *Id.* at 25.

## STANDARD OF REVIEW

In reviewing Commerce's determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F.Supp.2d 1345, 1346-47 (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory

NON-CONFIDENTIAL VERSION

explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Failure to consider "an important aspect of the problem" renders a determination by an agency arbitrary.  *State Farm*, 463 U.S. at 43.

 In reviewing Commerce's interpretation of a silent or ambiguous statutory provision, "courts must exercise independent judgment" to identify the "best reading of a statute."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024).  To do so, courts will use "traditional tools of statutory construction," namely, the "statute's text, structure, and legislative history, and apply all the relevant canons of interpretation."  *Bio-Lab, Inc. v. United States*, No. 24-00024, 2025 WL 1099710, at *8 (CIT 2025) (quoting *Loper Bright Enters.*, 603 U.S. at 394, *Delverde, SrL. v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000).  The question before the court is "whether Commerce's interpretation of the statute is aligned with the best reading, or the reading the court would have reached if no agency were involved….  In determining the 'best reading,' the court should defer to Commerce only to the extent contemplated by the statute itself."  *Bio-Lab, Inc.* 2025 WL 1099710, at *9 (quoting *Loper Bright*, 603 U.S. at 400).

## ARGUMENT

### I. Commerce's Comparison of Deacero's U.S. Production Process for PC Strand to a PC Strand Production Process Starting with Primary Iron and Steel Inputs Is Unlawful

 Section 781(a) of the Act provides, in relevant part, that Commerce may include imported parts or components used to complete or assemble merchandise in the United States within the scope of an antidumping duty order if the "process of assembly or completion in the United States is minor or insignificant."  19 U.S.C. § 1677j(a)(1)(C).  In both the Preliminary and Final

11

Determinations, Commerce assessed whether Deacero's USA's PC strand production process was "minor or insignificant" within the meaning of Section 781(a) by comparing it to what Commerce characterized as a fully integrated production process in Mexico.  PDM at 15; IDM at 13.  In so doing, Commerce unlawfully defined what it termed the "entire production process" or "overall manufacture" as beginning with "primary iron and steel inputs" (e.g., steel billets or scrap).  PDM at 15; IDM at 13.

Commerce's definition of the "entire manufacturing process" as extending back to "primary iron and steel inputs" finds no support in the text, structure, legislative history, or purpose of section 781(a) and is thus contrary to law.  Further, Commerce's determination is also arbitrary and capricious because Commerce deviated from its own well-established practice in circumvention inquiries of defining the "entire manufacturing process" in accordance with the ITC's description of the production process.  Moreover, Commerce's determination is unsupported by substantial evidence because the record shows that Deacero's "entire manufacturing process" to produce PC strand in fact starts with wire rod, not "primary iron or steel inputs" such as scrap or steel billets.  This record evidence is composed of authoritative ITC and Commerce definitions of the manufacturing process, which in turn are based on statements from the Defendant-Intervenors themselves.

In practical terms, Commerce's approach in this case has broad and deleterious implications for the administration of AD/CVD orders and investment in the United States related to the manufacturing of steel products.  In essence, Commerce's methodology would automatically expand the scope of orders on downstream steel products to include all imported intermediate steel products, because the scale of investment in the United States for any given downstream product will rarely be comparable to the cost of a process that includes the

investment value of a steel mill that produces the primary iron and steel inputs, *i.e.*, steel billets. Commerce's approach becomes even more unreasonable if other related upstream investment costs were included within the definition of the "entire manufacturing process," *e.g.*, the investment required to mine the iron ore – or perhaps even to acquire the land-use rights to mine the ore. This sweeping interpretation finds no support in section 781(a).

Accordingly, this Court should remand back to Commerce to issue a determination consistent with the law, its prior practice, and the substantial evidence on the record – namely, evidence showing that the ITC's description of the production process as starting with the drawing of wire rod, and not the manufacturing of primary iron and steel inputs, is the first step of the PC strand manufacturing process and the appropriate comparative lens for this inquiry.

### A.    Commerce's Determination is Contrary to the Text, Structure, History, and Purpose of Section 781(a) and Thus Unlawful

This is a case of first impression where Commerce acknowledges that its proposed methodology has not been "squarely addressed for a steel product in the relatively less common section 781(a) circumvention inquiries." IDM at 13. Commerce asserts that section 781(a) allows it to adopt a definition of the "entire manufacturing process" that includes primary iron and steel inputs, based on a practice it developed under a different statutory provision. Specifically, Commerce asserts that it can adopt practices developed under section 781(b), a separate provision of the Act addressing manufacturing that occurs in a "foreign country," in the section 781(a) context, which instead deals with manufacturing that occurs in the United States. There is no support in the text, structure, or history of section 781(a) for Commerce's approach. Section 781(a) and 781(b) merit different approaches, because Commerce's use of practices

developed under section 781(b) results in a remedy under section 781(a) that discourages certain types of manufacturing operations in the United States – not third countries.[3]

In practical terms, Commerce's approach in this case has broad and negative implications for the administration of AD/CVD orders and investment in the United States related to the manufacturing of steel products. If allowed to stand, Commerce's methodology will expand the scope of orders on downstream steel products to include all imported intermediate steel products, because the scale of investment in the United States for any given downstream product will rarely be comparable to the cost of a process that includes the investment value of a steel mill that creates the primary iron and steel inputs. Commerce's approach becomes even more unreasonable if other related upstream investment costs were included within the definition of the "entire manufacturing process," *e.g.*, the investment required to mine the iron ore – or perhaps even to acquire the land-use rights to mine the ore. This sweeping interpretation finds no support in section 781(a).

The text of section 781(a) does not include the term "complete production process." Rather, section 781(a)(1)(C) directs Commerce to evaluate whether "the process of assembly or completion in the United States is minor or insignificant." Section 781(a)(2) provides that, "{i}n determining whether the process of assembly or completion is minor or insignificant," Commerce shall take into account various factors, including "the nature of the production process in the United States." 19 U.S.C. § 1677j(a)(1)(C), (a)(2)(C).

Likewise, the legislative history of section 781(a) does not describe or define the term "complete production process." However, it does indicate that Congress intended to "focus {}

---

[3] Deacero does not concede that Commerce's approach is reasonable under section 781(b), but it is even more unreasonable under section 781(a) in light of the deleterious effects upon investment in the United States.

14

Court No. 24-00212

the anticircumvention inquiry … toward the *nature of the process* performed in the United

States." S. Rept. 103-412 at 81-82 (emphasis in original). Congress was most concerned about

"the circumvention of antidumping or countervailing duty orders through the establishment of

*screwdriver assembly operations* in the United States." Statement of Administrative Action

accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103rd Cong., 2d Sess.,

vol. 1 ("SAA") at 893 (emphasis added). The SAA explains further that the amendments to

section 781(a) were intended to address the situations in which foreign exporters could "rely on

many off the shelf components" and "circumvent an antidumping duty order by establishing a

screwdriver operation in the United States that purchases as many parts as possible from a third

country." *Id.* Indeed, the SAA references "screwdriver" operations three times as the reason that

Congress amended section 781. SAA 893-94. Commerce has also recognized the "stereotypical

circumvention" scenario that section 781 is intended to address, namely the scenario in which "a

screwdriver manufacturer set up in {the United States or} a third country … is sent all of the

parts that it merely snaps together to avoid AD and CVDs." *See Crystalline Silicon Photovoltaic*

*Cells, Whether or Not Assembled into Modules, from the Republic of China: Final Scope*

*Determination and Final Affirmative Determinations of Circumvention With Respect to*

*Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23,

2023), and accompanying IDM with respect to the Kingdom of Thailand ("Thailand IDM") at

67.

Here, Commerce utilized a hypothetical "complete production process" or "entire

manufacturing process" that begins with primary steel and iron inputs, even though the record

shows that this made-up process reflects neither Deacero's process in Mexico, the ITC's

description of the PC strand production process, nor the process of other U.S. producers.

Deacero's production process in the United States, as shown in the record, is far more complex

than the "screwdriver assembly operations" Congress intended for circumvention inquiries to

address.

Moreover, substantial record evidence shows that Deacero's operations in Mexico are not

fully integrated. Deacero produces PC strand at only one facility in Mexico: its plant in Morelia.

Deacero previously produced PC strand at its Celaya facility **[                    ]**, but this plant

no longer produces PC strand. Deacero, Comments on Petitioners' Request for Circumvention

Ruling (Sept. 6, 2023) at 13, P.R. 22, C.R. 10 ("Deacero Comments on Petitioners' Request").

Importantly, the Morelia facility does not produce its own wire rod; rather, it sources wire rod

either from Deacero's Celaya facility, from **[**

**]**. *See id*. at 14; Deacero's Response to

Remainder of Circumvention Inquiry Initial Questionnaire (Oct. 30, 2023) at 34, P.R. 69, C.R. 21

("Deacero 10/30/2023 IQR"). In fact, in 2021, 2022, and 2023 (through August), Deacero's

Morelia facility sourced **[                    ]**, respectively, of the wire rod used in its PC

strand production process from **[            ]**. *Id.* Although Petitioners initially argued that

Deacero's Mexican PC strand operations were fully integrated, *see* Petitioner's Request for

Circumvention Ruling at 3, P.R. 1, C.R. 1, they later withdrew this argument and admitted that it

was not fully integrated. *See* Petitioners' Letter, Petitioners' Reply to Deacero's Comments on

Petitioners' Request for Circumvention Inquiry (Sept. 20, 2023) at 6, P.R. 27, C.R. 15

("Petitioners' Reply to Deacero's Comments"); *see also* Deacero, Deacero's Pre-Preliminary

Comments (Mar. 21, 2024) at 12-13, P.R. 118, C.R. 182. Nevertheless, Commerce maintains

BUSINESS PROPRIETARY
INFORMATION DELETED    NON-CONFIDENTIAL VERSION

that it is appropriate to evaluate Deacero's operations as hypothetically integrated – despite the fact that the record evidence contradicts this conclusion.[4]

Moreover, the legislative history to section 781(a) emphasizes that the purpose of the provision is to properly address circumvention while, at the same time, ensuring that anticircumvention inquiries "will not deter legitimate investment, characterized by the addition of substantial value."  SAA at 894.  Commerce self-servingly references this portion of the legislative history to assert that, "because Commerce only finds circumvention when it determines that the assembly or completion operations in the United States are minor, enforcement of section 781(a) of the Act does not deter 'legitimate investment, characterized by the addition of substantial value.'"  IDM at 14 (quoting SAA at 894).  However, the SAA presumes that Commerce will *correctly* find that assembly or completion operations in the United States are minor; an *incorrect* determination, however, will obviously deter legitimate investment, and would be contrary to Congress's contemplated purpose.  Here, Commerce's *wrongful* circumvention determination will deter "legitimate investment," because it leaves all other U.S. producers of PC strand vulnerable to circumvention determinations.  This is because the record evidence shows that other U.S. producers of PC strand begin production with wire rod as the raw material.  *See, e.g.*, Deacero Comments on Petitioners' Request at 8-9, P.R. 22, C.R. 10 (citing *Prestressed Concrete Steel Wire Strand from Brazil, India, Japan, Korea, Mexico, and Thailand*, Inv. Nos. 701-TA-432 and 731-TA-1024-1028 and AA1921-188 USITC Pub. No. 5130 at I-11, fig. I-1 (Oct. 2020) ("PC Strand From Brazil et al. (2020)")) (showing a Sumiden graphic

---

[4] In its Preliminary Determination, Commerce stated that "Deacero's actual level of integration is not dispositive in our analysis," and that it has "frequently compared the investments necessary to finish the subject merchandise with those investments necessary to produce the inquiry merchandise in an integrated facility, regardless of the affiliations or the actual level of integration … when analyzing the 'level of investment' in circumvention proceedings."  PDM at 12.

representation of the production process that shows the "Raw Material" for the PC production process as "Hot Rolled SAQ 1080 Wire Rod"). Thus, even if a foreign producer's entire production process, as defined by the ITC, were to occur in the United States, under Commerce's flawed conception of a "complete production process" beginning with "primary iron and steel inputs," their operations could nevertheless be found to be circumventing the Order. Commerce's methodology would thereby dissuade legitimate investment in the United States, as no foreign producer would invest in the United States when faced with such a high likelihood of a circumvention determination.

In sum, Commerce's interpretation of section 781(a) as requiring an analysis of the nature of the production process that occurs in the United States by reference to a hypothetical "complete production process" that starts with the primary iron and steel inputs (and, thus a production process that is not reflective of industrial reality) is contrary to the text, legislative history, and purpose of section 781(a). The Court should find that the best interpretation of the statute requires a comparison of the nature of the production process in the United States to the description of the production process in the ITC Report or the respondent's actual production process in the subject country. The Court should remand to Commerce to reconsider whether Deacero's production process in the United States is "minor or insignificant" on that basis.

### B.    Commerce's Determination is Contrary to CIT and Federal Circuit Case Law

Commerce cites several CIT and Federal Circuit cases to support its erroneous view of the "entire manufacturing process" for PC strand to include primary iron and steel inputs. These citations are unavailing. To begin, Commerce cites *Macao Commercial* to support its claim that its "consistent practice has been to rely on the complete production process ... for a section 781(a) inquiry and in the third country for a section 781(b) inquiry. IDM at 15 & n.77 (citing

Court No. 24-00212

*Macao Commer. & Indus. Spring Mattress Mfr. v. United States*, 437 F.Supp.3d 1324, 1329 (CIT

2020) ("*Macao Commercial*")).  However, the court in *Macao Commercial* did not define the

"complete production process," but instead addressed the respondent's "attempts to use

semantics to draw a difference between manufacturing, on the one hand, versus completion or

assembly on the other."  437 F.Supp.3d at 1329.  Reference to *Macao Commercial* is inapposite

to the present proceedings for several reasons.  First, it concerns analysis under section 781(b)

rather than section 781(a) which, as discussed above, is a separate subsection that reflects unique

congressional intent and purpose, and therefore merits a distinct approach.

Second, Deacero does not draw any distinction between "manufacturing" and

"completion or assembly," as was the case in *Macao Commercial*.  Rather, at issue here is

Commerce's definition of a "complete production process" extending back to primary iron or

steel inputs (*i.e.*, steel billet and scrap) – something the court in *Macao Commercial* did not

discuss, and that is not explained in the public version of the underlying determination.  *See*

*Uncovered Innerspring Units from the People's Republic of China*, 83 Fed. Reg. 42,254 (Dep't of

Commerce Aug. 21, 2018) and accompanying PDM at 15 ("Specific details regarding the

company's production process descriptions, … are proprietary information, and, therefore, a

discussion of the information used in our analysis is contained in the {proprietary} Preliminary

Analysis Memorandum.") (citing *Anticircumvention Inquiry on Uncovered Innerspring Units*

*from the People's Republic of China*: Macao Commercial Preliminary Analysis Memorandum)

(unchanged in Final Determination).[5]  Third, Commerce applied facts available with adverse

inferences against the respondent in *Macao Commercial*, a scenario not present in the instant

proceedings.  Thus, *Macao Commercial* does not support Commerce's decision to analyze the

nature of Deacero's production process in the United States by reference to a hypothetical "entire

manufacturing process" that goes back to primary iron and steel inputs.

Next, Commerce asserts that its approach to defining the "entire manufacturing process"

has been upheld by the CIT and affirmed by the Federal Circuit.  PDM at 11 n.70, IDM at 13-15

nn.64, 78-79 (citing *Al Ghurair Iron & Steel LLC v. United States*, 536 F.Supp.3d 1357, 1368

(CIT 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023).  This is incorrect.  *Al Ghurair* and its

underlying Commerce determinations involve a 781(b) analysis that did not address what

constitutes "the entire manufacturing process" in a case like this one, where Commerce's

approach in the circumvention inquiry conflicts with both its and the ITC's description of the

manufacturing process in the underlying investigation.  In fact, the determinations underlying *Al

Ghurair* specifically cited the ITC Report's description of the manufacturing process for

corrosion-resistant steel products as the basis for determining whether the "process of completing

CORE in the UAE from Chinese-origin substrate is minor or insignificant."  *See Certain

Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary

Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 8,841 (Feb.

18, 2020) and accompanying PDM at 13-14 & nn.41, 43-45 (citing *Certain Corrosion-Resistant

---

[5] The scant information available in the public version of the Preliminary Analysis Memorandum shows that the
facts of *Macao Commercial* differ significantly from those at issue here.  It describes the assembly of mattress
innersprings, a production process Commerce described as involving limited materials inputs, a "minimal number of
personnel" and "a concomitantly small structure."  *See* Anticircumvention Inquiry on Uncovered Innerspring Units
from the People's Republic of China: Macao Commercial Preliminary Analysis Memorandum (Aug. 9, 2018)
(ACCESS Barcode 3742460).  Contrast these facts with Deacero USA's significant personnel investments and large
structure.

Court No. 24-00212

*Steel Products from China, Italy, India, Korea, and Taiwan*, Investigation Nos. 701-TA-534-537 and 731-TA-1274-1278 (Final), ITC Pub. No. 4620 (2016) (ITC CORE Report)), unchanged in *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (July 13, 2020)).

Thus, Commerce is incorrect when it states that the CIT and Federal Circuit have upheld its practice of adopting a different definition of the "entire manufacturing process" than the ITC – or, indeed, than reflected in the record. They have not. Accordingly, prior court decisions do not support Commerce's interpretation of section 781(a). This Court should remand to Commerce for further analysis consistent with relevant case law and the Court's opinion.

## C. Commerce's Determination Deviates From Its Prior Practice and Is Thus Arbitrary and Capricious

Other Commerce determinations not reviewed by the courts similarly illustrate that Commerce's approach deviates from its normal practice in circumvention inquiries under section 781(a) of the Act. In section 781(a) inquiries, the Department has consistently relied on the ITC's description of the production process to identify the relevant home country activities that form the basis for assessing whether a respondent's production process in the United States is "minor or insignificant." Here, however, Commerce refused to rely on the ITC's description of the production process, or any other record evidence illustrating Deacero's production process. Accordingly, Commerce's determination was arbitrary and capricious. *See Jiaxing Brother Fastener Co. v. United States*, 380 F.Supp.3d 1343, 1364 (CIT 2019) ("Commerce's decision is … arbitrary and capricious because it fails to address the inconsistency of its conclusion with past practice"); *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42.

**Court No. 24-00212**

For example, in the *Uncoated Paper* circumvention inquiries, the Department relied on the ITC's description of the production process of uncoated paper sheets to examine whether respondents' production process in the United States was minor or insignificant. These inquiries were conducted under section 781(a). *See Certain Uncoated Paper from the People's Republic of China: Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 Fed. Reg. 72,624 (Dep't Commerce Nov. 13, 2020); *Certain Uncoated Paper from Brazil: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls*, 86 Fed. Reg. 7,261 (Dep't Commerce Jan. 27, 2021); and *Certain Uncoated Paper from Indonesia: Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 86 Fed. Reg. 7,266 (Dep't Commerce Jan. 27, 2021). In examining whether the completion of the subject merchandise in the United States was "minor or insignificant," the Department noted that "petitioners provided … the ITC Final where the ITC described the production process of uncoated paper sheets." *See Certain Uncoated Paper from Brazil: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls*, 86 Fed. Reg. 7,261 (Dep't Commerce Jan. 27, 2021), and accompanying PDM at 9. The Department relied upon this ITC description in its analysis. *See id.* Commerce attempts to distinguish this case by noting that Commerce used the ITC's description of the production process to substantiate certain other factual premises. *See* IDM at 16. Be that as it may, Commerce still adhered to the ITC's definition of the production process.

Similarly, in *Ferrovanadium and Nitrided Vanadium From the Russian Federation* – also a section 781(a) determination – the Department found that its determination that the respondent's U.S. production process involved "significant operations" was consistent with the

ITC's description of the production process.  *See Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77 Fed. Reg. 6,537, 6,541 (Dep't Commerce Feb. 8, 2012); *Ferrovanadium and Nitrided Vanadium From the Russian Federation: Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 46,712 (Dep't Commerce Aug. 6, 2012), and accompanying IDM at 8.

Commerce attempts to distinguish this determination by arguing that it involved a respondent considered to belong to the U.S. domestic industry based on the significance of its production activities.  IDM at 16.  That does not change the fact that Commerce did not deviate from the ITC's description of the production process in that case.  The same is true for *Forklift Trucks From Japan*, which was also a section 781(a) determination that specifically referenced the ITC report's description of the production process.  *Certain Internal-Combustion, Industrial Forklift Trucks From Japan; Negative Preliminary Determination of Circumvention of Antidumping Duty Order*, 54 Fed. Reg. 50,260, 50,262 (Dep't Commerce Dec. 5, 1989) ("We based our analysis on a comparison of the U.S. manufacturing process as set forth in the ITC's Final Determination (USITC Pub. 2082, May 1988) and the respondents' description of their production processes.  According to the ITC account, there are three distinct processes in the manufacturing of a completed forklift truck: (1) Fabrication of the frame, (2) fabrication of the mast, and (3) final assembly of the forklift truck.").

Moreover, in *Hot-Rolled Lead and Bismuth*, the Department found that respondents' respective operations were not minor or insignificant based on the ITC's description of production processes.  *See Hot-Rolled Lead and Bismuth Carbon Steel Products From Germany and the United Kingdom; Negative Preliminary Determinations of Circumvention of*

*Antidumping and Countervailing Duty Orders*, 63 Fed. Reg. 24,156, 24,158 (Dep't Commerce May 1, 1998) ("The {ITC} states that the manufacturing process for the production of hot-rolled lead bar consists of three different stages: (1) melting, (2) casting, and (3) hot-rolling."). Commerce responds that this determination is unhelpful to Deacero's argument because "the production process described in the ITC report for those products began with the melting and pouring of steel, thus representing the full production process," IDM at 16. However, the appropriateness of including melting and pouring of steel within the definition of the "full production process" for carbon steel has no bearing on whether those activities are properly included within the full production process for PC strand, as the ITC's decision *not* to include them demonstrates. In any case, Commerce does not dispute that it did, in fact, rely upon the ITC's description of the production process in *Hot-Rolled Lead and Bismuth*.

Thus, in these determinations under section 781(a), Commerce assessed whether the allegedly circumventing activity in the United States was "minor or insignificant" by comparing the respondents' U.S. production process with the production process in the home market as defined by the ITC's description of the manufacturing process for the subject merchandise.

In the instant proceeding, however, Commerce deviated from the ITC's definition of the production process, which is consistent with Deacero's actual process and, as a result, also arbitrarily deviated from its own well-established practice. *See Jiaxing Brother Fastener Co.*, 380 F.Supp.3d at 1364.

Commerce "disagree{s} that it is appropriate to treat the ITC's description of the manufacturing process for PC strand as dispositive of the production process," stating instead that its "consistent practice has been to rely on the complete production process," and that it has a "long-standing practice of evaluating the entire manufacturing process," IDM at 13, 15.

**NON-CONFIDENTIAL VERSION**

However, Commerce relies upon prior determinations in the distinct context of section 781(b),

and also elides the central question of how to properly define the "complete production process."

     None of the other cases Commerce cites in its Final Determination support its argument.

For example, Commerce cites *PRCB from Taiwan*, *SDGE from China*, and *Plywood from China*

to claim that it has a practice of evaluating the "entire manufacturing process."  However,

Commerce's citation to these cases elides the core issue of how Commerce is to assess the nature

of the production process in the United States, as none discusses the issue; indeed, *SDGE from*

*China* and *Plywood from China* are both section 781(b) cases.  *See* IDM at 15 (citing *Small*

*Diameter Graphite Electrodes from the People's Republic of China: Affirmative Preliminary*

*Determination of Circumvention of the Antidumping Duty Order and Extension of Final*

*Determination*, 77 Fed. Reg. 33405, 33412-13 (June 6, 2012); *Polyethylene Retail Carrier Bags*

*from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty*

*Order*, 79 Fed. Reg. 31302 (June 2, 2014) and accompanying PDM at 9-11; *Certain Hardwood*

*Plywood Products from the People's Republic of China: Final Scope Determination and*

*Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty*

*Orders*, 88 Fed. Reg. 46740 (July 20, 2023) and accompanying IDM at Comment 2).

     As noted above in the discussion of *Al Ghurair*, *CORE from China UAE* similarly does

not support Commerce's arguments, as it is a section 781(b) case that relies upon the ITC

definition of the manufacturing process.  *See* IDM at 13 (citing *Certain Corrosion-Resistant*

*Steel Products from the People's Republic of China: Affirmative Preliminary Determination of*

*Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 8,841 (Feb. 18, 2020) and

accompanying PDM at 13-14 (citing *Certain Corrosion-Resistant Steel Products from China,*

*Italy, India, Korea, and Taiwan*, Investigation Nos. 701-TA-534-537 and 731-TA-1274-1278

(Final), ITC Pub. No. 4620 (2016)), unchanged in *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (July 13, 2020).

In sum, Commerce unreasonably departed from prior practice, rendering its decision arbitrary and capricious. *See, e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 380 F.Supp.3d 1343, 1365 (CIT 2019). The Court should therefore remand back to Commerce for further consideration.

### D.     Commerce's Determination is Unsupported by Substantial Record Evidence

Commerce compared Deacero's U.S.-based PC strand production process with Deacero's process in Mexico, based on its own view of "the full production process for PC strand, from the beginning stages of steel production." IDM at 14. However, in so doing, Commerce ignored substantial record evidence showing that, in fact, the "production process" for PC strand begins with the drawing of wire rod. Commerce's determination is thus unsupported by substantial evidence.

Substantial record evidence indicates that the drawing of wire rod, not the production of primary steel or iron inputs, constitutes the beginning of the PC strand production process. The ITC based its definition of the production process on the Defendant-Intervenors' own information. For example, Sumiden submitted a diagram of the PC strand production process to the ITC in a 2020 sunset review of the Order, stating that "wire rod" is the raw material for PC strand, and depicting the process of drawing wire rod as the first step of the production process. *See* Deacero Comments on Petitioners' Request at 9, P.R. 22, C.R. 10 (citing PC Strand from Brazil et al. (2020) at I-11 and Fig. I-1). Elsewhere, Sumiden and Insteel argued that "the department should increase raw material costs to reflect the actual cost of *wire rod*{,}" thereby

**Court No. 24-00212**

emphasizing that wire rod is the raw material. *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed Concrete Steel Wire Strand from Mexico,* 68 Fed. Reg. 68,350 (Dec. 8, 2003), and accompanying IDM at 7 (emphasis added). Similarly, the Defendant-Intervenors asserted in the circumvention ruling request that wire rod is "the primary input for PC strand." *See, e.g.*, Petitioners' Request for Circumvention Ruling at 5, P.R. 1, C.R. 1, ("Since 2002, Deacero has been subject to antidumping duties on wire rod, the *primary input* for PC strand") (emphasis added). The CEO of Sumiden stated:

> Sumiden, like most PC strand manufacturers, purchases high carbon steel wire rod for its PC strand production. We draw the wire rod into carbon steel wire before stranding the wire into PC strand. All other U.S. producers of PC strand undertake the same process of purchasing wire rod for conversion first to wire, then stranding into PC strand.

*Id*., Exhibit 4, para. 6. Sumiden's CEO could not have been clearer on this point, describing the company's "fully integrated PC strand facility … {as a} facility that *takes wire rod and manufactures it into PC strand*." *Id.*, para. 15 (emphasis added). Thus, like the ITC, Defendant-Intervenors have stated unambiguously that the PC strand production process begins with drawing wire rod.

27

**Court No. 24-00212**

Accordingly, the ITC has repeatedly found that the PC strand production process consists of four stages: drawing, stranding, stabilizing, and packaging.[6]   During the original antidumping investigations of PC strand from Mexico, both Commerce and the ITC repeatedly defined the production process as starting with wire rod, which it identified as the raw material input for PC strand.  In initiating the less-than-fair-value ("LTFV") investigation on PC strand from Mexico, Commerce defined the scope as follows:

> For purposes of these investigations, prestressed concrete steel wire (PC strand) is steel strand produced from wire of non-stainless, non-galvanized steel, which is suitable for use in prestressed concrete (both pretensioned and post-tensioned) applications.  The product definition encompasses covered and uncovered strand and all types, grades, and diameters of PC strand.

*Notice of Initiation of antidumping duty investigations: Prestressed Concrete Steel Wire Strand From Brazil, India, the Republic of Korea, Mexico, and Thailand*, 68 Fed. Reg. 9,050 (Dep't Commerce Feb. 27, 2003).

Then, in its preliminary phase report in the original investigation, the ITC quoted the scope language above and stated: "PC strand is made from hot-rolled, high-carbon steel wire rod, which is first cleaned and descaled.  The steel wire rod is then drawn into wire, fabricated into

---

[6] *Prestressed Concrete Steel Wire Strand From Argentina, Colombia, Egypt, Indonesia, Italy, Malaysia, Netherlands, Saudi Arabia, South Africa, Spain, Taiwan, Tunisia, Turkey, Ukraine, and United Arab Emirates*, Inv. No. 701-TA-646 and 731-TA-1502- 1516 (Preliminary), USITC Pub. No. 5062, at I-10 – I-11 (June 2020); *Prestressed Concrete Steel Rail Tie Wire from China and Mexico*, Inv. No. 731-TA-1207-1208 (Final), USITC Pub. No. 4473 at I-8 – I-10 (June 2014); *Prestressed Concrete Steel Wire Strand From China*, Inv. No. 701-TA-464 and 731-TA-1160 (Final), USITC Pub. No. 4162 at I-12 (June 2010) ("PC strand is produced from hot-rolled, high carbon steel wire rod through a production process consisting of four distinct steps: drawing, stranding, stabilizing, and packaging. The drawing step begins with cleaning and descaling to remove dirt and mill scale from the hot rolled, high-carbon steel wire rod before feeding it through the wire drawing dies."); *Prestressed Concrete Steel Wire Strand from Brazil, India, Korea, Mexico, and Thailand*, Inv. No. 701-TA-432 and 731-TA-1024-1028 (Final), USITC Pub. No. 3663 at 8 (Jan. 2004); *Prestressed Concrete Steel Wire Strand From Spain*, Inv. No. 701-TA-164 (Final), USITC Pub. No. 1281 at 6 (May 1984) ("PC strand is produced from uncoated round high-carbon steel wire which has been cold-drawn from wire rods to suitable sizes, then fabricated by a stranding machine into required strand sizes."); *Prestressed Concrete Steel Wire Strand From Brazil*, Inv. No. 701-TA-152 (Final), USITC Pub. 1325 at A-2 (Mar. 1983); *Prestressed Concrete Steel Wire Strand From France*, Inv. No. 701-TA-153 (Final), USITC Pub. 1325 at A-2 (Dec. 1982); *Prestressed Concrete Steel Wire Strand From The United Kingdom*, Inv. Nos. 701-TA-89 (Final), USITC Pub. 1343 at A-2 (Dec. 1982).

multi-wire strand, and thermally stress-relieved." *Prestressed Concrete Steel Wire Strand from*

*Brazil, India, Korea, Mexico, and Thailand*, USITC Inv. Nos. 701-TA-432 and 731-TA-1024-

1028  USITC Pub. No. 3589, at 6 (Mar. 2003).  The Department retained this scope language in

its final affirmative determination in the LTFV.  *See Notice of Final Determination of Sales at*

*Less Than Fair Value and Negative Final Determination of Critical Circumstances: Prestressed*

*Concrete Steel Wire Strand from Mexico,* 68 Fed. Reg. 68,350 (Dec. 8, 2003).  In addition, in its

final phase determination, the ITC reaffirmed its definition of the domestic like product from the

preliminary phase, with which the Petitioners agreed.  *Prestressed Concrete Steel Wire Strand*

*From Brazil, India, Korea, Mexico, and Thailand*, Inv. Nos. 701-TA-432 and 731-TA-1024-1028

(Final), USITC Pub. No. 3663 at 9 (Jan. 2004) ("PC Strand from Brazil et al. (2004)").  The ITC

also made multiple statements noting that wire rod is the primary raw material input for PC

strand.  For example, the ITC stated: "PC strand is made from hot-rolled, high-carbon steel wire

rod, which is first cleaned and descaled.  The steel wire rod is then drawn into wire, . . ."  *Id.* at 6.

Similarly, the first sentence of the section of the staff report on "Product Characteristics" states:

"PC strand is made from hot-rolled, high-carbon steel wire rod."  *Id.* at I-7.  It makes sense to

treat wire rod as the raw material for PC strand because wire rod is also used to produce a range

of other downstream products unrelated to PC strand.  For example, Deacero uses wire rod to

produce [

                                                                ].  *See* Deacero 3/7/24 SQR at 6, P.R. 110,

C.R. 165; *see also* Deacero Pre-Prelim Comments at 20, P.R. 118, C.R. 182.

        And yet, Commerce ignored this record evidence – that is, extensive and repeated

acknowledgement by both the ITC and Commerce that the PC strand production process begins

with the drawing of wire rod as the raw material (conclusions drawn from the Defendant-

**Court No. 24-00212**                                      **NON-CONFIDENTIAL VERSION**

Intervenors' own statements) – to instead define the production process beginning with "primary iron and steel inputs."  Accordingly, this Court should find that Commerce's determination is contradicted by substantial record evidence and contrary to law.  Instead, record evidence indicates that the proper definition of the "entire manufacturing process" begins with the drawing of wire rod.

II.     **Commerce's Determination That Deacero's PC Strand Production Process in the United States is Minor or Insignificant is Unreasonable, Unsupported by Substantial Evidence, and Unlawful**

To determine whether the process of assembly or completion in the United States is "minor or insignificant" under section 781(a)(1)(C) of the Act, section 781(a)(2) of the Act directs Commerce to consider the following five factors: the level of investment in the United States; the level of research and development ("R&D") in the United States; the nature of the production process in the United States; the extent of production facilities in the United States; and whether the value of the processing performed in the United States represents a small proportion of the value of the merchandise sold in the United States.  19 U.S.C. § 1677j(a)(2).  The record evidence in this proceeding, when evaluated against these statutory factors, demonstrates that Deacero is not engaged in circumvention and that Deacero USA's PC strand production process resembles that of other domestic PC strand producers.

A.     **Commerce's Determination That Deacero's U.S. Investment Is Minor Is Unsupported by Substantial Record Evidence**

In the Preliminary and Final Determinations, Commerce found that Deacero's investment in the United States is minor.  However, in reaching this conclusion, Commerce ignored substantial record evidence that Deacero has invested significant sums in operations directly related to its PC strand operations.

For example, Deacero has invested approximately [                    ] in its PC strand

production in Houston.  Prelim. Analysis Memo at 4, P.R. 121, C.R. 183 (citing Deacero Letter,

Deacero's Response to Supplemental Questionnaire (Feb. 5, 2024) at Exhibit SUPP-21, P.R. 97,

C.R. 145). [

     ].  Deacero Comments on Petitioners' Request, Exhibit 10, P.R. 22, C.R. 10 (providing

the full list of all the equipment used for the production of PC strand at the Houston facility,

including the original cost of all listed machinery).  Moreover, Deacero's PC strand production

requires highly-skilled workers who must be fully trained to operate the equipment, learn the

product, and produce a product that meets essential quality standards.  Deacero USA [

                    ].  *See id*. at 27-28.   Deacero's [                    ] dollar

investment in its U.S. PC strand business weighs against a finding that its U.S. process is "minor

or insignificant."

### B.   Commerce's Determination That Deacero's Level of R&D in the United States Is Minor Is Unsupported by Substantial Record Evidence

In its Preliminary and Final Determinations, Commerce found that Deacero USA's

Houston facility [                                        ] and, accordingly, that it

is "consistent with our practice to find [          ] R&D expenditures to weigh in favor of

finding that the process of assembly or completion is minor or insignificant."  Prelim. Analysis

Memo at 6, P.R. 121, C.R. 183; IDM at 18.  It did so even though it acknowledged that "neither

Deacero's U.S. nor Mexico operations are R&D intensive."  IDM at 18.  Commerce's approach

is unreasonable because it assesses Deacero's R&D in the United States on absolute terms,

whereas it assesses the other factors on a relative basis using the "complete production process"

in Mexico as the point of reference.  *See* IDM at 17 ("we continue to analyze whether Deacero

USA's process of assembly or completion in the United States is 'minor or insignificant' … by comparing its U.S. production of PC strand with Deacero SAPI's operations in Mexico to produce PC strand"), *id.* at 18 ("we compared the full amount of Deacero's reported investment to restart PC strand production in Houston to Deacero's reported investments in its various plants in Mexico"), *id.* at 19 ("We concluded that the significant extent of production facilities Deacero operates in Mexico … are more extensive than Deacero USA's Houston facilities."). Commerce did not explain why it adopted an inconsistent approach in evaluating R&D on absolute terms, but the other factors on relative terms.

Moreover, if Commerce were to evaluate Deacero's R&D on relative terms, substantial record evidence shows that Deacero's U.S. operations are comparable to its operations in Mexico, because neither expends a significant amount on R&D. The domestic producers acknowledged in the inquiry request that PC strand production does not entail significant R&D expenditures. *See* Petitioners' Request for Circumvention Ruling at 11, P.R. 1, C.R. 1. ("Based on Sumiden's experience, however, **[**

**]**."). Based on this substantial record evidence, Commerce should have found that Deacero's R&D in the United States is comparable to its R&D in Mexico and, accordingly, that this factor does not weigh in favor of an affirmative determination. Thus, Commerce's determination that Deacero's level of R&D in the United States weighs in favor of finding that its U.S. process is minor or insignificant is unsupported by substantial record evidence.

    **C.**    **Commerce's Determination That the Nature of Deacero's Production Process in the United States Is Minor Is Unsupported by Substantial Record Evidence**

In its Preliminary and Final Determinations, Commerce concluded that the "nature of Deacero USA's production process in the United States is minor because Deacero USA's production stages only involve processing the HCS wire into PC strand rather than also making the HCS wire from wire rod or the wire rod from basic inputs." IDM at 18. However, as demonstrated above, this conclusion is based on an inaccurate definition of the PC strand production process and is contradicted by substantial record evidence.

Commerce erroneously determined that PC strand production begins with the "collection and sorting of scrap which is then melted for the production of billets produced in its steel mill.

[

]. Prelim. Analysis Memo at 6-7, P.R. 121, C.R. 183. However, as discussed above, consistent with its past practice in circumvention inquiries under section 781(a), Commerce should have based its assessment of the nature of Deacero USA's production process on the ITC's description of the PC production process or, at least, on the respondent's actual production process in the subject country. Historically, the ITC has consistently defined PC strand production as starting with wire rod and identified four steps in the production process, including: drawing, stranding, stabilizing, and packaging.[7]

Here, the record evidence indicates that Deacero USA performs three of the four standard PC strand production steps – *i.e.*, stranding, stabilizing, and packaging – at its Houston facility. Deacero also performs certain product testing at its Houston facility. Drawing is the only production step that Deacero USA does not perform in the United States. The drawing production step is relatively unsophisticated and minor. For the HCS wire used at Deacero's Houston facility, the drawing is conducted in Deacero's Celaya Wire Plant. The process begins

---

[7] *See supra* n.6.

**BUSINESS PROPRIETARY INFORMATION DELETED**

with the cleaning and descaling of wire rod – essentially, submerging wire rod in chemicals – and also involves reducing the diameter of the wire rod by passing it through a series of dies.  *See* Deacero 10/30/2023 IQR at 8-9, P.R. 69, C.R. 21.  At the end of the drawing process, there is just unstranded, unbraided HCS wire, and nothing resembling PC strand.

Nevertheless, Commerce ignored the substantial record evidence and concluded that "Deacero USA only performs the final stages of processing steel inputs into PC strand…."  PDM at 14, IDM at 18.  This conclusion mischaracterizes the four-stage production process for PC strand, which starts with wire rod.  Commerce summarily rejected Deacero's argument that it should adhere to the ITC's description of the PC production process.

Commerce's analysis for this factor is unreasonable.  By Commerce's reasoning, unless a producer is manufacturing PC strand from primary iron or steel inputs (*i.e.*, steel billet or scrap) in the United States, that producer's process will be considered "minor or insignificant" and, therefore, to be circumventing the Order.  The only way to avoid being swept into the Order on PC strand is to make it from primary iron and steel inputs in the United States.

Most if not all of the domestic producers who requested this inquiry do not do this.  The record demonstrates that [                                        ] purchase Mexican-origin wire rod to make PC strand.  For example, [

].  *See* Deacero Comments on Petitioners' Request, Exhibit 17, P.R. 26, C.R. 14 (showing [                                        ]).  In addition, [

].  *See id.*  Accordingly,

Commerce's reasoning here would produce an absurd result of finding that **[**

**]** were circumventing the Order.

Accordingly, this Court should find that Commerce's determination is unsupported by

substantial evidence and otherwise not in accordance with law.

> **D.   Commerce's Determination That the Extent of Deacero's Production
> Facilities in the United States Is Minor Is Unsupported by Substantial
> Record Evidence**

Commerce ignored substantial record evidence to conclude that Deacero USA's

production facilities are insignificant, relying primarily on the improper expansion of its lens of

comparison to include Deacero's "facilities and machines in Mexico for the production of billets,

wire rod, and wire products."  PDM at 16-17, IDM at 19.

However, drawing is the only stage of PC strand production that Deacero USA does not

perform in the United States.  This stage, which Deacero performs at its Celaya Wire Plant, is

relatively rudimentary and preparatory for the PC strand production process.  The production

steps that Deacero USA performs in the United States are the most sophisticated stages of the

process and impart the essential character of PC strand to the steel cable.  The stranding, heating

and tensioning, and subsequent steps performed in the United States are significantly more

complex and capital-intensive than the process of drawing wire that occurs in Mexico.  Further,

the PC strand production capacities at Deacero's Houston and Morelia facilities are comparable,

as both facilities have one stranding machine.  The production capacity for the stranding machine

in Houston is **[**                            **]** and the practical production capacity is **[**

**]**.  The production capacity for PC strand at the Morelia facility is **[**

**]**.  *See* Deacero 10/30/23 IQR at 6, 27, P.R. 69, C.R. 21.

It is inappropriate to compare Deacero's U.S. facilities to its "facilities and machines in Mexico for the production of billets, wire rod, and wire products," because the Mexico-based operations are not only relatively less complex than those in the United States, but they are also used to produce multiple other types of products aside from PC strand.  Thus, for the purposes of the production of PC strand – which begins with drawing wire rod – this factor weighs against a finding that the process in the United States is minor or insignificant.  This Court should thus find that Commerce's determination is unsupported by substantial record evidence and otherwise not in accordance with law.

### E.    Commerce's Determination that the Value of Processing Performed in the United States Accounts for a Small Proportion of the Value of PC Strand Is Unsupported by Substantial Record Evidence

In the Preliminary and Final Determinations, the Department incorrectly found that the value of processing performed in the United States is [        ] percent of the total value of Deacero USA's PC strand produced and sold in the United States.  Prelim. Analysis Memo at 10, P.R. 121, C.R. 183; *see also* IDM at 20.  Commerce arrived at this figure by calculating a constructed cost buildup of Deacero USA's cost to produce PC strand in Houston and dividing it by the per-unit value of Deacero USA's sales of PC strand in the United States during the period in question.  Specifically, to the value of the HCS wire that Deacero imports from Mexico, the Department added Deacero USA's reported costs during the inquiry period for direct materials, direct labor, factory overhead, packing, selling, general and administrative expenses (SG&A), and net interest expense.  Prelim. Analysis Memo at 10, P.R. 121, C.R. 183; IDM at 20.  However, this methodology implicitly inflates the value of the HCS wire that Deacero USA imports to produce the PC strand in the United States and thus understates the value of the processing performed in the United States.  Earlier in its analysis, Commerce calculated that the

36

value of HCS wire that Deacero USA imports from Mexico as  [                    ] of the total value

of Deacero's U.S. PC strand produced and sold in the United States.[8]  *See* Prelim. Analysis

Memo for Deacero at 3, P.R. 121, C.R. 183; Deacero Case Brief at 20 n.66, P.R. 148, C.R. 190.

It follows that the value of the processing that Deacero USA performs in the United States to

transform the imported HCS wire into PC strand is approximately [      ] percent of the value of

the PC strand.  This also suggests that the [        ] percent value that Commerce calculated is

not an accurate estimate of the value added by Deacero's U.S. operations.  This further

demonstrates that Commerce's determination is not supported by substantial evidence.

### III.    Commerce's Evaluation of Deacero's Imports Fails to Consider Evidence Concerning the Pattern of Trade and Is Thus Unlawful

Section 781(a)(3) of the Act requires Commerce to consider several contextual factors in

its circumvention determinations.  These factors include the "pattern of trade, including sourcing

factors," and "whether imports into the United States of the parts or components produced in

such foreign country have increased after the initiation of the investigation which resulted in the

issuance of such order or finding."  19 U.S.C. § 1677j(a)(3)(A), (C).  The statute provides that

these factors are to inform Commerce's evaluation of the context surrounding alleged

circumvention.

Neither the statute nor Commerce's regulations identify any particular time periods for

Commerce to consider in evaluating the factors under section 781(a)(3).  Although the statute

thus affords some degree of discretion to Commerce to determine a reasonable timeframe, it does

not permit Commerce to ignore relevant record evidence.  Instead, Commerce must analyze the

pattern of trade over an adequately broad timeframe that will allow it to assess whether an

---

[8] Deacero disputed the accuracy of the Department's calculation, arguing that the true value was closer to [
        ].  *See* Deacero Case Brief at 20, P.R. 148, C.R. 190; IDM at 20.

**Court No. 24-00212**                                    NON-CONFIDENTIAL VERSION

increase in imports is, in fact, an indication of circumvention. Here, Commerce blindly accepted the requestors' proposed timeframe, which the requestors gerrymandered to ensure Commerce would find an increase in imports. Commerce's finding is unlawful because Commerce failed to consider all of the evidence on the record, including contrary evidence that undermined its conclusions. *See, e.g.*, *Lingyi Chengen Imp. and Exp. Co. v. United States*, 391 F.Supp.3d 1283, 1292 ("An agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem{ or} offered an explanation for its decision that runs counter to the evidence before the agency…'") (quoting *State Farm*, 463 U.S. at 43). If Commerce had properly evaluated the evidence in the record, it would have found a consistent and stable pattern of trade – *i.e.*, a long period of steady and apparently non-injurious levels of imports – interrupted only by a brief and temporary hiatus in production of PC strand that [

]. What Commerce purports to be an "increase" in imports is, in fact, a resumption of the normal pattern of trade from this temporary pause in production.

As Deacero explained to Commerce, Deacero USA's increased imports of HCS wire from Mexico starting in 2021 [

]. *See* Deacero Case Brief at 23, P.R. 148, C.R. 190. Deacero began producing PC strand in the United States in 2010, and continuously imported HCS strand from Mexico for that purpose. Deacero Comments on Petitioners' Request at 3, P.R. 22, C.R. 10. Then, in [

]. *See id.* at 4, Exhibit 3, P.R. 23, C.R. 12. [

].  Deacero Pre-Prelim Comments at 22-23, P.R. 118, C.R. 182.  This evidence explains the pattern of trade observed from 2018-2020 as compared to 2021-2023.

In its Preliminary Analysis Memorandum, Commerce references the [

] in passing, but mischaracterizes the facts surrounding the [                    ], suggesting that Deacero USA first [

].  Prelim. Analysis Memo at 3-4, P.R. 121, C.R. 183.  This finding is incorrect.  In reality, Deacero USA [

].

Similarly, and contrary to the record evidence, Commerce stated in its Preliminary Determination that Deacero USA's stranding machine in Houston was previously in Celaya but was later transferred to the United States to circumvent the Order on wire mesh from Mexico. *See* PDM at 14.  This statement ignores record evidence demonstrating that the actual reason for the transfer was to resume the U.S. production activities that Deacero USA had been engaged in for many years until [

].

Commerce summarily dismissed this evidence as irrelevant – stating that it did not understand "how {Deacero's} status as a previous U.S. producer of PC strand affects our analysis under section 781(a)(3)(C) of the Act, or in evaluating any of the factors under Commerce's statutory circumvention analysis."  IDM at 25.   Commerce makes two related

**BUSINESS PROPRIETARY INFORMATION DELETED**

arguments, both of which fail to address the core issue of the context in which it should have evaluated Deacero's production activities.

First, Commerce states that "{c}ircumvention{} can occur at any time, even years after an AD or CVD order is issued." Though this may be true as a general matter, substantial record evidence demonstrates that the pattern of trade and Deacero's sourcing patterns in this case are not the result of attempts to circumvent the Order. Commerce arbitrarily defined the inquiry and comparison periods based entirely "on the requestors' suggestion, which was based on when the requestors believed Deacero's circumvention to have begun."[9] IDM at 24 (citing Petitioners' Request for Circumvention Ruling, Exhibit 4, P.R. 1, C.R. 1).

As explained above, the requestors' self-serving and results-oriented timeframe was guaranteed to show an increase in imports given the cessation and resumption of Deacero's PC strand production in the United States [

            ]. It was arbitrary for Commerce to adopt this timeframe as the comparison period and ignore the record evidence of the pattern of trade, including sourcing patterns, over the entire history of the Order given the undisputed evidence showing the existence of a [

            ] which had an impact on the pattern of trade. *Cf. Al Ghurair* 65 F.4th at 1358 (concluding that, because Commerce "explained that the period allowed it to analyze whether the trade patterns changed in reaction to the AD and CVD orders' investigations, when parties learned that they could potentially have to pay AD and CVD duties," "Commerce's timeframe selection was not arbitrary" and did not "evidence{} circumvention" under section 781(b)(3)) (internal quotations omitted).

---

[9] Although Commerce initially explained its timeframe selection was tied to the imposition of the entirely unrelated *Wire Mesh Order* in its Preliminary Determination, it later walked this back as merely "provid{ing} context" for its timeframe selection, and instead pointed to the requestors' statements as the reason why it selected this comparison period. IDM at 24.

Second, Commerce asserts that that the "true reason for {Deacero's} resumption of PC strand production in the United States {is} immaterial to our statutory circumvention analysis." IDM at 24.  While section 781(a) does not contain a scienter requirement, the statute does require Commerce to evaluate the pattern of trade, including sourcing patterns, as context in determining whether to include parts or components in the scope of an order.  19 U.S.C. § 1677j(a)(3). Deacero's status as a "previous U.S. producer of PC strand" is highly material to the evaluation of the pattern of trade and sourcing patterns: a long-standing U.S. producer that has consistently sourced from Mexico throughout the history of the Order is clearly in a different position with respect to a circumvention inquiry than, for example, a foreign producer with no history of U.S. production who set up facilities in the United States "when it learned that {it} could potentially have to pay AD {} duties." *Al Ghurair* 65 F.4th at 1358.

The Department's determination willfully ignores that [

].  *See* Deacero Case Brief at 24.  If Deacero's U.S.-based operations were engaging in a pattern of trade that indicated genuine circumvention, [

].  *See id.*

Accordingly, Commerce's determination that the pattern of trade in this case supports a finding of circumvention is arbitrary, unsupported by substantial record evidence, and otherwise contrary to law.

**NON-CONFIDENTIAL VERSION**

## CONCLUSION

Deacero requests that the Court find that Commerce's determinations are unsupported by substantial evidence and otherwise not in accordance with law.  Deacero requests that the Court remand for redetermination consistent with the Court's opinion.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Jacob A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr
   LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for Deacero S.A.P.I. DE C.V. and
Deacero USA, Inc.*

Dated: May 19, 2025

**Court No. 24-00212**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's

Standard Chambers Procedures, the undersigned certifies that this Memorandum in Support of

Deacero's Rule 56.2 Motion for Judgment on the Agency Record complies with the word

limitation requirement.  The word count for the Memorandum, as computed by WilmerHale's

word processing system, is 12,663 words, including footnotes, and excluding the title page, table

of contents, table of authorities, counsel's signature block, and this certificate.

<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>Deacero S.A.P.I. de C.V. and Deacero USA, Inc.</u>
(Representative Of)

<u>May 19, 2025</u>
(Date)