## UNITED STATES COURT OF INTERNATIONAL TRADE

**DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC.,**

        **Plaintiffs,**

    **v.**

**UNITED STATES,**

        **Defendant,**

    **and**

**INSTEEL WIRE PRODUCTS COMPANY, SUMIDEN WIRE PRODUCTS CORPORATION, AND WIRE MESH CORP.,**

        **Defendant-Intervenors.**

**Before: Joseph A. Laroski, Jr., Judge**
**Court No. 24-00212**

**<u>NON-CONFIDENTIAL VERSION</u>**

**Business Proprietary Information Removed From Pages 16-18, 21-22**

## <u>PLAINTIFFS' REPLY IN SUPPORT OF DEACERO'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

David J. Ross
Stephanie E. Hartmann
Jacob A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr
  LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for Deacero S.A.P.I. de C.V. and Deacero USA, Inc.*

Dated: October 20, 2025

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

I.  Commerce's Complete Production Process Baseline Conflicts with the
    "Best Reading" of Section 781(a) ............................................................... 2

    A.  The Best Reading of Section 781(a) Requires Comparison to the
        Actual Production Process of the Subject Merchandise ........................... 4

    B.  None of Defendant's or Defendant-Intervenors' Cited Cases Is Binding
        or Dispositive, Because They Involve Section 781(b) ............................. 9

    C.  None of Defendant-Intervenors' Cited Commerce Determinations
        Support Collapsing Sections 781(a) and 781(b) ................................... 12

II. Commerce's Determination is Unreasonable, Unsupported by Substantial
    Evidence, and Otherwise Not in Accordance with Law ............................... 13

    A.  Commerce Consistently Relies on ITC Reports to Inform its Definition
        of the Production Process ................................................................. 13

    B.  The Record Evidence Demonstrates That the Production Process
        for PC Strand Begins with the Drawing of Wire Rod ........................... 15

III. Deacero Adequately Briefed Its Arguments Concerning the Five
     Section 781(a)(2) Factors ........................................................................ 18

IV. Commerce's Pattern of Trade Analysis Ignored Material Evidence and
    Was Arbitrary ......................................................................................... 20

CONCLUSION ................................................................................................ 22

NON-CONFIDENTIAL VERSION

### <u>TABLE OF AUTHORITIES</u>

Page(s)

**STATUTES**

19 U.S.C. § 1677j(a)(1)(C) ...............................................................................3, 4

19 U.S.C. § 1677j(a)(2)(C) ...................................................................................4

19 U.S.C. § 1677j(a)(2)....................................................................................19

19 U.S.C. § 1677j(a)(3)(A), (C)........................................................................20

**CASES**

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021),
    *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023) ...........................................................9, 10

*Am. Silicon Techs. v. United States*, 261 F.3d 1371 (Fed. Cir. 2001)...........................11

*Brown v. Gardner*, 513 U.S. 115 (1994)........................................................................5

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................................................10

*DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340 (CIT 2020)....................22

*FAG Italia S.p.A. v. United States*, 110 F. Supp. 2d 1055 (2000) ...............................21

*Hanon Sys. Ala. Corp. v. United States*, Slip Op. 25-94, No. 24-00013 .................11, 19

*Hlds (B) Steel Sdn Bhd v. United States*, 2024 WL 244937 (CIT 2024) ................11, 12

*King v. Burwell*, 576 U.S. 473 (2015)............................................................................5

*Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625 (2012) ........................................10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...................................3, 6, 10

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (CIT 1993) ...............22

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm
    Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................................22

*NEC Corp. v. United States*, 151 F.3d 1361 (CIT 1998)............................................20

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)........................22

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F. Supp. 3d 1249
(CIT 2016) ..............................................................................................22

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...............................................12

*Util. Air Regul. Grp. v. EPA.*, 573 U.S. 302 (2014).........................................5

**ADMINISTRATIVE DETERMINATIONS**

*Alloy and Certain Carbon Steel Threaded Rod From the People's Republic of
China; Carbon and Alloy Steel Threaded Rod From the People's Republic
of China: Final Affirmative Determination of Circumvention of the
Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 68,586 (Aug.
27, 2024) ...........................................................................................12, 13

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Affirmative
Final Determinations of Circumvention of the Antidumping Duty and
Countervailing Duty Orders*, 84 Fed. Reg. 70,934 (Dec. 26, 2019).................21

*Certain Corrosion-Resistant Steel Products From the People's Republic of
China: Affirmative Final Determination of Circumvention Involving the
United Arab Emirates*, 85 Fed. Reg. 41,957 (July 13, 2020) ...........................21

*Certain Tissue Paper Products from the People's Republic of China: Affirmative
Final Determination of Circumvention of the Antidumping Duty Order*, 78
Fed. Reg. 40,101 (July 3, 2013)........................................................................21

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 88
Fed. Reg. 77,283 (Nov. 9, 2023)........................................................................14

*Notice of Initiation of Antidumping Duty Investigations: Prestressed Concrete
Steel Wire Strand from Brazil, India, the Republic of Korea, Mexico, and
Thailand*, 68 Fed. Reg. 9,050 (Feb. 27, 2003) ..................................................20

*Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative
Determination of Circumvention of the Antidumping Duty Order*, 89 Fed.
Reg. 79,252 (Sept. 27, 2024) ..............................................................................1

*Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative
Determination of Circumvention of the Antidumping Duty Order;
Correction*, 89 Fed. Reg. 85,844 (Oct. 29, 2024) ..............................................1

**LEGISLATIVE MATERIALS**

Statement of Administrative Action accompanying the Uruguay Round
Agreements Act, H.R. Doc. No. 316, 103rd Cong., 2d Sess., vol. 1 ........................7, 8, 11

## INTRODUCTION

On behalf of Plaintiffs Deacero S.A.P.I. de C.V. and Deacero USA, Inc. (collectively, "Deacero"), we submit this reply brief in support of Deacero's Rule 56.2 motion for judgment upon the agency record challenging certain aspects of the final determination of the U.S. Department of Commerce ("Commerce") in the circumvention inquiry pursuant to the antidumping duty order on prestressed concrete steel wire strand from Mexico, concerning imports of certain high carbon steel wire from Mexico. *See Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 89 Fed.Reg. 79,252 (Sept. 27, 2024) ("*Final Determination*"), P.R. 156, ECF No. 20-1, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 155, ECF No. 20-2, as amended by *Prestressed Concrete Steel Wire Strand From Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order; Correction*, 89 Fed.Reg. 85,844 (Oct. 29, 2024), P.R. 159.

This reply brief addresses arguments that the Defendant, the United States ("Defendant") and Defendant-Intervenors, Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corp. (collectively, "Defendant-Intervenors") made in their response briefs. *See* Def.'s Resp. to Pls.' Mot. for J. on the Agency R. (July 23, 2025), ECF No. 31 ("Def.'s Response Br."); Defendant-Intervenors' Resp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. (Aug. 6, 2025), ECF No. 35 ("D-I Response Br.").

As demonstrated below, Commerce unlawfully interpreted and applied section 781(a) of the Tariff Act of 1930 (the "Act") by reference to what Commerce characterized as the "complete production process" for PC strand, starting with the production of the primary iron and steel inputs used to produce the parts and components that Deacero uses to manufacture PC

1

strand in the United States. The "best reading" of the Act's text and structure does not support

this expansive framing, which is inconsistent with Congress' intent in targeting processing

operations in the United States that are truly "minor or insignificant" – described repeatedly in

the legislative history as "screwdriver operations" – and designed to circumvent the discipline of

AD/CVD orders. Further, Commerce's determination is unreasonable, unsupported by

substantial evidence, and otherwise not in accordance with law. Commerce fails to meaningfully

engage with record evidence demonstrating that the production process for PC strand begins with

the drawing of wire rod into HCS wire, rendering its determination unsupported by substantial

evidence. This evidence includes Deacero's own production process in Mexico, Defendant-

Intervenors' own statements, and the ITC's repeated findings that the production process for PC

strand consists of four stages: drawing of wire rod, stranding, stabilizing and packaging.

Finally, Commerce's determination is unsupported by substantial evidence because the flawed

premise of its analysis – that the statutory analysis must take into account not only the production

of the subject merchandise from the relevant parts and components, but also the production of

the parts and components themselves – predetermines the outcome of each of the five factors set

out in section 781(a)(2) as "minor or insignificant."

Given Commerce's failure to meaningfully analyze the record evidence in accordance

with the best reading of the statutory text, we respectfully request that the Court remand

Commerce's determination for reconsideration.

## ARGUMENT

**I.    Commerce's Complete Production Process Baseline Conflicts with the "Best Reading" of Section 781(a)**

The first core question for this Court is how to interpret section 781(a), and whether

Commerce's methodology comports with that "best reading" in determining whether Deacero's

"process of assembly or completion in the United States is minor or insignificant." 19 U.S.C. §

1677j(a)(1)(C). Specifically, the Court must determine the "best reading" of section

781(a)(1)(C) and (2). *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). This is

a question of first impression, as Commerce acknowledges, because the correct interpretation of

section 781(a) has not been "squarely addressed for a steel product in the relatively less common

section 781(a) circumvention inquiries." IDM at 13. As explained in Deacero's opening brief,

Commerce unlawfully assessed whether Deacero's USA's PC strand production process was

"minor or insignificant" within the meaning of section 781(a) by comparison to what it termed

the "full" or "complete production process" or "entire manufacturing process starting from the

beginning stages of steel production," meaning "primary iron and steel inputs" (*e.g.*, steel billets

or scrap). PDM at 15; IDM at 12, 13. The Defendant and Defendant-Intervenors argue that this

flawed interpretation is "reasonable" and should be accorded deference. *See* Def.'s Response Br.

at 14; D-I Response Br. at 9. However, post *Loper Bright*, the question for this Court is not

whether Commerce's interpretation is "reasonable," but whether it is the "best reading" of the

statute. It is not. Commerce's interpretation – which sweeps in the entire upstream metallurgical

value chain – finds no support in the text, structure, legislative history, or purpose of section

781(a).

  Instead, this Court should independently interpret section 781(a) to find that the "best

reading" respects the Congressional objective of protecting legitimate investments in the United

States, like Deacero's. Specifically, in evaluating "the nature of the production process in the

United States" to determine "whether the process of assembly or completion is minor or

insignificant," this Court should find that the proper focus is the actual production process for the

subject merchandise from the relevant parts and components, not the production of the parts and

components themselves.  Here, the record evidence – comprised of the relevant ITC reports, Deacero's actual production process in Mexico, and the petitioners' (now Defendant-Intervenors') own statements – shows that the production process for PC strand begins with wire rod, and consists of four, and only four, steps: drawing, stranding, stabilizing, and packaging.

>    **A.    The Best Reading of Section 781(a) Requires Comparison to the Actual Production Process of the Subject Merchandise**

Section 781(a) allows Commerce to include imported parts or components used to complete or assemble subject merchandise in the United States within the scope of an antidumping duty order if "the process of assembly or completion in the United States is minor or insignificant."  19 U.S.C. § 1677j(a)(1)(C).  Section 781(a)(2) provides that, "{i}n determining whether the process of assembly or completion is minor or insignificant," Commerce shall take into account various factors, including "the nature of the production process in the United States."  19 U.S.C. § 1677j(a)(1)(C), (a)(2)(C).  In evaluating these factors, Commerce in this case relied instead upon a so-called "complete production process" – a term that does not appear in the statute – that included the production of the relevant parts and components in Mexico.  *See, e.g.*, IDM at 17.

In addition to having no support in the statutory text, Commerce's "complete production process" interpretation is untethered from industrial reality in this case, as detailed in the record.  Commerce defines the "complete production process" for PC strand as beginning with the production of the primary iron and steel products and intermediate steelmaking processes involved in the production of the parts and components used to produce PC strand – in other words, activities that are far removed from production of the subject merchandise.  IDM at 14-15.  That approach distorts the statutory analysis and undermines congressional intent to protect legitimate investments in the United States.  The "best reading" of section 781(a) would

accomplish this objective by interpreting whether domestic production of subject merchandise in the United States is "minor or insignificant" by reference to the respondent's actual production process of the subject merchandise from the relevant parts and components, not whether it is "minor or insignificant" relative to the entire continuum of steel production, including the production of the parts and components. By anchoring its baseline in the production of the primary iron and steel inputs, Commerce expanded its analysis beyond what section 781(a) contemplates and undermined the statutory framework.

In support of its interpretation, Commerce relies upon arguments developed under an entirely different statutory provision – namely, section 781(b), which addresses manufacturing that occurs in a "foreign country." Defendant and Defendant-Intervenors argue that sections 781(a) and 781(b) should be interpreted uniformly, downplaying the differences between these distinct statutory provisions. For example, Defendant asserts that "there is hardly any distinction in the law or in the SAA between the two provisions." Def.'s Response Br. at 14. Defendant invokes a "presumption that a given term is used to mean the same thing throughout a statute," *id.* (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)), to justify applying the same methodology under both subsections. But that presumption is not absolute – rather, it "'readily yields to context,' and a statutory term may mean different things in different places." *King v. Burwell*, 576 U.S. 473, 493 (2015) (quoting *Util. Air Regul. Grp. v. EPA.*, 573 U.S. 302, 320 (2014)). Here, it must yield. Section 781(a) addresses circumvention through operations "in the United States," while section 781(b) addresses circumvention "in other foreign countries." Congress deliberately created separate subsections to reflect those differences. Applying the

same interpretation to both would erase those distinctions and render Congress's choice meaningless.[1]

In any case, Defendant concedes that Congress *did* provide for "minor differences to account for further assembly in the United States as opposed to a foreign country." *Id.* Having acknowledged these differences, Defendants nevertheless conclude that "it is reasonable for Commerce to apply the same comparative 'minor and insignificant' methodology in administering both statutes," *i.e.*, 781(a) and 781(b). But under *Loper Bright*, the question for the Court is not whether Commerce's approach is "reasonable" (which it is not), but rather whether such an interpretation is the "best reading" of the statute. *Loper Bright*, 603 U.S. at 400. It is not.

Defendant-Intervenors go further, arguing that the legislative history "fail{s} to draw any distinction between Congress's intent with regard to section 781(a) and 781(b)" because it directs Commerce to focus on "the *nature of the process* performed in the United States or a third country." D-I Response Br. at 6. This argument disregards the statute's plain language for at least two reasons: First, it disregards that under Commerce's flawed interpretation of the statute, Commerce focuses its analysis in large part upon the nature of the process performed in the home market to produce the parts and components, not the nature of the process performed in the United States or a third country. Second, it disregards that Congress created two separate provisions to address two distinct circumvention scenarios – one involving operations "in the United States" under section 781(a), and another involving operations "in a foreign country" under section 781(b). Treating these provisions as interchangeable erases that deliberate structural choice.

---

[1] Deacero does not concede that Commerce's approach here is lawful under section 781(b).

This structural distinction is critical when viewed alongside the circumvention statute's purpose, which Defendant-Intervenors themselves describe as protecting "U.S. jobs and workers from unfair imports." D-I Response Br. at 4-5; PDM at 12; IDM at 12-17. Deacero agrees, as it emphasized in its opening brief that the SAA provides that anticircumvention inquiries should "not deter legitimate investment, characterized by the addition of substantial value." Mem. in Supp. of Pl. Deacero's Rule 56.2 Mot. for J. Upon the Agency R. (May 19, 2025), ECF No. 28 ("Deacero Br.") at 17 (quoting Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103rd Cong., 2d Sess., vol. 1 ("SAA") at 894). If Congress did not intend Commerce to apply the statute in a way that would discourage legitimate investment, then the distinction between Sections 781(a) and 781(b) is not incidental – it is essential. This distinction indicates that Commerce should proceed carefully in section 781(a) cases in evaluating production processes occurring "in the United States" to avoid dissuading legitimate investments like Deacero's. Indeed, Commerce's interpretation undermines the SAA's assurance that section 781 "will not deter legitimate investment." SAA at 894. This is because using the entirety of an industrial value chain (here, the production of the steel billets and other inputs used to produce the parts and components, as well as the processing of the parts and components to produce PC strand) as the basis for determining what is "minor or insignificant" means that any U.S. production operations involving anything less than that entire chain become "minor or insignificant." This would deter precisely the kind of capital-intensive, job-creating investments (like Deacero's) that Congress sought to protect.

Defendant's suggestion that the Commerce can analyze "a more comprehensive process of manufacture outside the United States," Def.'s Response Br. at 13, cannot be squared with this statutory objective and structure. An approach that examines not only the process involved in

assembling or completing the relevant parts and components in the United States, but also the process involved in producing the parts and components themselves from basic materials, would rarely if ever result in a finding that the U.S. operations are not "minor or insignificant." This would defeat Congress's assurance that Section 781 "will not deter legitimate investment."

Similarly, Defendant and Defendant-Intervenors mischaracterize the import of the repeated references to "screwdriver operations" in the legislative history. They argue that the SAA's reference to screwdriver operations is merely "illustrative" and "does not narrow the interpretation of the statute." Def.'s Response Br. at 15; D-I Response Br. at 8. Deacero does not dispute that the reference to "screwdriver operations" is illustrative and not exhaustive, but the illustration matters – Congress included this example to signal the type of processing that the statute is meant to address. This illustration frames Commerce's inquiry: operations that resemble screwdriver assembly (*i.e.*, where imported components are "snapped together" with negligible investment, facilities, or value-add) fall squarely within the statute's intended reach. However, there is nothing in the legislative history to support the conclusion that Congress intended Commerce to include the production of the imported components themselves in its analysis.

For example, the SAA states that "{i}n the case of certain products, particularly electronic products that rely on many off the shelf components, it is relatively easy for a foreign exporter to circumvent an antidumping duty order by establishing a screwdriver operation in the United States that purchases as many parts as possible from a third country." SAA at 893. But Congress' solution to this problem was to modify the statutory text to focus on the value of the processing performed in the United States (or the third country) relative to the value of the

finished article sold in the United States, not to expand Commerce's analysis to include the

process involved in producing the parts and components.  *See id.*

In short, the statutory text, structure, and purpose all point in the same direction: section

781(a) was designed to address circumvention occurring through "minor or insignificant" U.S.

operations, not to penalize substantial domestic operations by comparing them to an entire

upstream value chain that includes the production of the relevant parts and components.

Commerce's interpretation disregards Congress's deliberate distinction between sections 781(a)

and 781(b) and threatens to deter legitimate U.S. investment – the very outcome the statute was

intended to prevent.  Under *Loper Bright*, the Court must adopt the best reading of the statute:

one that confines the comparison to the respondent's actual production of the subject

merchandise and rejects Commerce's overbroad approach.

### B.   None of Defendant's or Defendant-Intervenors' Cited Cases Is Binding or Dispositive, Because They Involve Section 781(b)

Defendant and Defendant-Intervenors cite several cases to support Commerce's flawed

interpretation of "minor or insignificant" by reference to a "complete production process."

These cases are unavailing.

The primary authority Defendants cite is *Al Ghurair*, but as Deacero has explained, this

case is inapposite to the current proceedings for at least two reasons.  *See* Def.'s Response Br. at

14; D-I Response Br. at 3; *see also* PDM at 11 n.70, IDM at 13-15 nn.64, 78-79 (citing *Al

Ghurair Iron & Steel LLC v. United States*, 536 F.Supp.3d 1357, 1368 (CIT 2021), *aff'd*, 65

F.4th 1351 (Fed. Cir. 2023)).  First, as Deacero has explained, *Al Ghurair* and its underlying

Commerce determinations involve a 781(b) analysis that did not address the proper interpretation

of 781(a).  Deacero Br. at 20.  Second, *Al Ghurair* was decided before *Loper Bright* and

explicitly relied on the now-defunct *Chevron* framework, which required courts to defer to

"permissible" agency interpretations. *See Al Ghurair*, 536 F.Supp.3d at 1380 (describing as "reasonable" certain of Commerce's findings in instances where "the statute is silent") (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)). Under *Loper Bright*, courts no longer defer to an Agency's "permissible" or "reasonable" interpretations of the law; rather, they "apply{} all relevant interpretive tools" to determine the "best meaning" of the statute. *Loper Bright*, 603 U.S. at 400.

Further, although the Supreme Court in *Loper Bright* stated that its holding "do{es} not call into question prior cases that relied on the *Chevron* framework," *Loper Bright*, 603 U.S. at 412, such holdings are subject to statutory *stare decisis*, which is not absolute. As Justice Sotomayor wrote in *Kurns v. RR Friction Products*, "it is important to be precise about what {the original decision} held," because if a prior decision is not directly on point, statutory *stare decisis* does not apply. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 641 (2012) (J. Sotomayor, concurring in part). *Al Ghurair* addressed a circumvention inquiry under section 781(b), not section 781(a). *See, e.g.*, *Al Ghurair* at 1368-72 (comparing production processes and facilities in the UAE to those in China). Thus, whether *Al Ghurair* remains good law for purposes of section 781(b), it is not binding or persuasive on the "best meaning" of section 781(a), which directs Commerce to evaluate whether production processes occurring "in the United States" (and not elsewhere) are "minor or insignificant."

Defendant and Defendant-Intervenors also cite decisions of this Court affirming Commerce's circumvention determinations under 781(b). These decisions are neither binding nor persuasive. As an initial matter, judges of this Court are not "bound to march in lockstep" with one another and are free to "depart from the holding of a brother judge . . . if {they are} convinced through independent analysis that the holding of {their} colleague is incorrect." *Am.*

*Silicon Techs. v. United States*, 261 F.3d 1371, 1381 (Fed. Cir. 2001).  Thus, the cases cited by

Defendant and Defendant-Intervenors should be closely examined by this Court – though none

should withstand the scrutiny.

Defendant cites *Hlds (B) Steel Sdn Bhd v. United States*, 2024 WL 244937 (CIT 2024), to

argue that the SAA's reference to "screwdriver" assembly does not limit Commerce's authority

under section 781(a) to addressing only "stereotypical circumvention" scenarios, because it

"plainly alludes to production operations in a third country that are 'minor or insignificant'".

Def.'s Response Br. at 15 (quoting *Hlds (B) Steel Sdn Bhd*, 2024 WL 244937, at *4 n.7).  But the

quoted language from the court's opinion in *Hlds (B) Steel* is *dicta* and does not advance

Defendant's argument – it simply assumes the question at issue.  Saying that "screwdriver

operations" are "illustrative of 'minor or insignificant' production" begs the question of what

qualifies as "minor or insignificant."  That is the interpretive issue before this Court.  The fact

that the SAA made three separate references to screwdriver assembly operations signals that this

is the type of processing that Congress intended to address.  SAA at 893-94.

Defendant-Intervenors cite *Hanon Sys. Ala. Corp. v. United States*, Slip Op. 25-94, No.

24-00013 (CIT July 21, 2025), to claim that Commerce's methodology is consistent with

precedent.  But *Hanon* upheld Commerce's fact-specific application of the five statutory factors

*under section 781(b)*.  The question of how to interpret 781(a) was not at issue in that case.  Nor

did *Hanon* diminish the relevance of legislative guidance in the SAA, as it acknowledged that

"screwdriver operations" are one type of circumvention activity that could be considered "minor

or insignificant."  *Id.* at *6.  Thus, none of the cases cited by Defendant or Defendant-Intervenor

is binding and dispositive of the issues presented in this appeal.

### C.    None of Defendant-Intervenors' Cited Commerce Determinations Support Collapsing Sections 781(a) and 781(b)

Defendant-Intervenors argue that "Commerce has appropriately developed its methodology over time in full awareness and consideration of its approaches under section 781 as a whole," seemingly invoking *Skidmore* deference.  *See, e.g.*, D-I Response Br. at 6 (quoting IDM at 13); *see also id.* at 3 ("Nor does Deacero dispute that Commerce has repeatedly employed the methodology used here in numerous other circumvention cases.").  *Skidmore* stands for the proposition that an agency's interpretation of its own statute "constitute{s} a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, (1944).  Under *Skidmore*, the deference merited depends on the thoroughness of the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade.  *Id.*  Defendants fail to show that Commerce's interpretation of section 781(a) merits *Skidmore* deference.

Defendant-Intervenors' two cited determinations do not demonstrate a thorough consideration of the meaning of section 781(a).  For example, *Certain Carbon Steel Threaded Rod from China* involved a dispute about whether inquiry merchandise (*i.e.*, unthreaded pins) were raw materials or "parts or components."  *See Alloy and Certain Carbon Steel Threaded Rod From the People's Republic of China; Carbon and Alloy Steel Threaded Rod From the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 89 Fed.Reg. 68,586 (Aug. 27, 2024), and accompanying IDM (Aug. 20, 2024) ("*Threaded Rod from China*").  Their quoted statement – that "the circumvention regulations are consistent with the proposition that section 781(a) of the Act should not be interpreted in a manner different from section 781(b), as the regulations refer to

'parts and components' in both instances," D-I Response Br. at 7 (quoting *Threaded Rod from China* at 9) – was made in the context of rejecting respondents' arguments that pins were raw materials, not components, which is not the issue here.

## II.    Commerce's Determination is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law

Commerce's application of section 781(a) to the facts of this case is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.  First, Commerce departed from its prior practice by failing to meaningfully engage with evidence of the ITC's repeated findings that the production process for PC strand consists of four stages: drawing, stranding, stabilizing, and packaging.  Second, Commerce failed to meaningfully engage with the substantial evidence submitted by Deacero *and the petitioners* (now Defendant-Intervenors) that demonstrates the same conclusion: the actual production process for PC strand begins with the drawing of wire rod into HCS wire, not with the production of the "primary iron and steel inputs" used to manufacture the parts and components that Deacero uses to produce PC strand in the United States.  Commerce's failure to meaningfully engage with this evidence renders its determination unsupported by substantial evidence.  None of the Defendant's or Defendant-Intervenors' arguments undermine this conclusion.

### A.    Commerce Consistently Relies on ITC Reports to Inform its Definition of the Production Process

Deacero demonstrated in its opening brief that Commerce has repeatedly relied on the ITC's description of the production process for the subject merchandise to identify the relevant stages of production that Commerce uses to assess whether the process of assembly or completion in the United States is "minor or insignificant."  *See* Deacero Br. at 21-26. Defendant's response that Commerce "has never articulated a practice of substituting its own

findings with those of the ITC" mischaracterizes both Commerce's methodology and Deacero's argument. Def.'s Response Br. at 17. Deacero is not arguing that Commerce has a practice of substituting its own findings with those of the ITC. Rather, Deacero is noting that Commerce has consistently referenced ITC reports to inform its understanding of the production process of the subject merchandise, as noted above. Commerce's practice is evident in numerous determinations where it cites ITC descriptions of production steps to frame its analysis under section 781(a). *See* Deacero Br. at 22-24 (discussing eight different preliminary and final Commerce determinations involving section 781(a)).

Furthermore, the Defendant's effort to buttress its argument by citing Commerce's statement in *Light-Walled Rectangular Pipe and Tube from China* fails, because Defendant takes the statement out of context. Def.'s Response Br. at 17-18. Defendant correctly notes that Commerce said, "the manufacturing process described in ITC reports . . . are not binding to Commerce's circumvention analysis . . . ." *See id.* (quoting *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 88 Fed.Reg. 77,283 (Nov. 9, 2023) and accompanying IDM at 44 ("*LWRPT* IDM")). However, Defendant fails to note that Commerce made this statement in response to the argument that it must rely *only* on the ITC's description of the manufacturing process to assess whether the process of assembly or completion is minor or insignificant. *LWRPT* IDM at 44. Once again, this is not what Deacero is arguing. Rather, Deacero is arguing that Commerce has a longstanding practice of relying on the ITC's factual descriptions to inform its definition of the production process, which Commerce failed to do here.

As Deacero explained in its brief, "the ITC has repeatedly found that the PC strand production process consists of four stages: drawing, stranding, stabilizing, and packaging."

Deacero Br. at 28; *see also id.* at n.6 (citing seven ITC reports from 1982 to 2020). Nothing in the Defendant's or the Defendant-Intervenors' responses rebuts Deacero's argument that Commerce failed to meaningfully engage with the relevant ITC reports. This evidence fairly detracts from the reasonableness of Commerce's approach to defining a "complete production process" back to "primary iron and steel inputs."

### B. The Record Evidence Demonstrates That the Production Process for PC Strand Begins with the Drawing of Wire Rod

Defendant-Intervenors seek to rebut Deacero's argument that the production process for PC strand begins with the drawing of wire rod by claiming that Commerce "relied on the full production process in Mexico <u>as described by Deacero itself</u>, beginning with the sorting and melting of scrap into steel billets." D-I Response Br. at 10 (emphasis in original) (*citing* Deacero 2SQR at 3-6, P.R. 110-115, C.R. 165-180). This is a flat mischaracterization of the record evidence. In actuality, the excerpt that the Defendant-Intervenors cite was in response to Commerce's *instruction* to Deacero to describe its production process in this way, "beginning with steel melting through wire production" and "including the sourcing of raw materials". *See* Deacero 2SQR at 2, P.R. 110, C.R. 165 (setting out Commerce's question). Defendant-Intervenors fail to note that Deacero objected to the premise of Commerce's question and devoted a full page of its response to explaining why Commerce's description of the production process was not only wrong, but inconsistent with the petitioners' own description and the ITC's:

> **Answer**: Wire rod is the raw material for PC strand. Both the U.S. International Trade Commission ("ITC") and the Petitioners themselves have identified wire rod as the raw material for PC strand production. During the original antidumping investigation, the ITC found that "PC strand is made from hot-rolled, high-carbon steel wire rod, which is first cleaned and descaled. The steel wire rod is then drawn into wire, fabricated into multi-wire strand, and thermally relieved." Moreover, the ITC identified wire rod as the "main material input in the production of PC strand." In addition, petitioners in the investigation, which included Insteel Wire Products Company and Sumiden Wire Products Corporation ("Sumiden"), argued "the Department should increase raw material

costs to reflect the actual cost of wire rod{.}"  Moreover, in the circumvention ruling
request, the Petitioners note that wire rod is "the primary input for PC strand" and
Sumiden's CEO describes "a fully integrated PC strand facility . . . {as a} facility that
takes wire rod and manufactures it into PC strand."  Indeed, Deacero **[**

                                                      **]**.  Accordingly, the record of this
inquiry and the original antidumping investigation on PC strand from Mexico establishes
that wire rod is the raw material for PC strand production.  Commerce has never extended
production back to the raw material steel input (i.e., billets) in a section 781(a)
circumvention inquiry.  To take such an approach in this inquiry would represent a
radical policy shift that undermines the purpose of antidumping and countervailing duty
laws by deterring U.S. investment.  As such, the production process of the wire rod used
in PC strand production is irrelevant to the Department's analysis.

*Id*. at 2-3 (footnotes omitted); *see also* Deacero 1SQR at 26, P.R. 95, C.R. 65 ("both the U.S.

International Trade Commission and Sumiden, one of the Petitioners, have identified wire rod as

the raw material for PC strand production.  As such, the production process of the wire rod used

in PC strand production is irrelevant to the Department's analysis.") (footnotes omitted).

Deacero did not want to provide a basis for Commerce to make a finding on the basis of adverse

facts available, so it did ultimately report the production processes for billets and wire rod as

Commerce instructed it to do, *see id*. at 3-5, but it stated repeatedly that the raw material for PC

strand is wire rod.  *See, e.g.,* Deacero 2SQR at 4, P.R. 110, C.R. 165.

Defendant takes a different approach, asserting that Deacero argued that "Commerce

erred by including wire production in its definition of the production process."  Def.'s Response

Br. at 16.  This is another mischaracterization.  There is no dispute that the production of wire is

part of the production process for PC strand.  Deacero's actual argument is that it was erroneous

for Commerce to include the production of the "primary iron and steel inputs" used to

manufacture the parts and components that Deacero uses to manufacture the PC strand in the

United States.

Moreover, Defendant seeks to defend Commerce's erroneous approach on the grounds that "{t}he relevant question driving the use of Commerce's comparative methodology is 'whether a producer would reasonably move its further processing across borders to avoid the discipline of an order.'"  Def.'s Response Br. at 16 (citations omitted).[2]  But although Commerce claimed that this was the reason for its approach, it failed to meaningfully engage with the record evidence relevant to this question.  If it had, the evidence would have supported a negative determination.

For example, Deacero reported that "the vast majority of wire rod and billet production at the [                    ] is *unrelated* to the production of high-carbon steel wire rod, and unrelated to the production of PC strand."  Deacero 2SQR at 6, P.R. 110, C.R. 165.  Deacero estimated that [

] *Id*.  In other words, the record evidence showed that fully [

].

In addition, Deacero also reported that "high-carbon wire rod is **not** manufactured exclusively for PC strand production" and that:

> there are various types of high carbon wires used to produce a wide range of products with different end-uses.  [

]

---

[2] Defendant also asserts that "{a} foreign producer with multiple factories, which supply each other with inputs, and which are each owned by the same overall parent would be able to move its production process across borders, regardless of the factories' locations."  *Id*.  This is a *non sequitur*:  Even under Commerce's erroneous approach, the question is not whether a foreign producer "would be able" to move its production process across borders, but whether it "would reasonably" do so.

*Id.* at 6-7.  Indeed, Deacero estimated that **[**


**]** *Id.*  This reflects the fact that

Deacero's Mexican operations produce multiple types of products other than PC strand, as

Deacero noted in its opening brief (*see* Deacero Br. at 36), which in turn supports the conclusion

that wire rod is properly considered to be the raw material for PC strand.

Deacero also reported to Commerce that over the course of 2021, 2022 and 2023, its

Morelia facility increasingly **[            ]** its souring of wire rod to the **[**

**]**.  Deacero IQR at

14, P.R. 69, C.R. 21.  In addition to supporting the conclusion that the actual production process

for Deacero begins with the sourcing of  wire rod – not the production of steel billet – this also

demonstrates that Commerce's "complete production process" approach does not reflect reality.

In sum, the record evidence demonstrates that the production process for PC strand

begins with the drawing of wire rod into HCS strand, not with the production of the "primary

iron and steel inputs" used to manufacture the parts and components that Deacero uses to

manufacture the PC strand in the United States.  It also demonstrates that, even under

Commerce's flawed "complete production process" approach, the record evidence does not

support the conclusion that Deacero would have "reasonably moved its further processing across

borders to avoid the discipline of an order." Commerce's failure to meaningfully engage with

this evidence renders its determination unsupported by substantial evidence and contrary to law.

**III.    Deacero Adequately Briefed Its Arguments Concerning the Five Section 781(a)(2)
          Factors**

Section 781(a)(2) of the Act directs Commerce to consider five factors in considering

whether the process of assembly or completion in the United States is "minor or insignificant"

under section 781(a)(1)(C). These are: the level of investment in the United States; the level of

research and development ("R&D") in the United States; the nature of the production process in

the United States; the extent of production facilities in the United States; and whether the value

of the processing performed in the United States represents a small proportion of the value of the

merchandise sold in the United States. 19 U.S.C. § 1677j(a)(2). In its opening brief, Deacero

explained how the record evidence in this proceeding, when evaluated against these five factors,

demonstrates that Deacero is not engaged in circumvention and that Deacero USA's PC strand

production process resembles that of other U.S. PC strand producers.

Defendant's contention that "Deacero's arguments are inadequately developed and

should be deemed waived" mischaracterizes the content and structure of Deacero's opening

brief. Def.'s Response Br. at 19. In fact, Deacero presented a comprehensive challenge to

Commerce's interpretation of section 781(a), as explained above. This is not, as Defendant-

Intervenors assert, "mere disagreement with Commerce's assessment of the record evidence."

D-I Response Br. at 13. Rather, Deacero explained how Commerce's methodology – which is

unlawful under the "best reading" of section 781(a) – infected Commerce's analysis of each of

the five factors underlying its determination that Deacero's PC strand production process in the

United States is "minor or insignificant." *See* Deacero Br. at 2. The question here is not whether

Commerce's methodology was "reasonable," as Defendant-Intervenors assert. *See* D-I Response

Br. at 12-13 (quoting *Hanon Sys.*, 2025 WL 2028398 at *3 (describing the standard of review in

review of a section 781(b) determination)). Rather, it is whether Commerce's methodology was

in accordance with the "best reading" of section 781(a). Here, Commerce applied its erroneous

methodology to the factual record, thereby resulting in an outcome that cannot be squared with

the "best reading" of section 781(a).

IV.    **Commerce's Pattern of Trade Analysis Ignored Material Evidence and Was Arbitrary**

Section 781(a)(3) of the Act requires Commerce to "take into account" the pattern of trade, including sourcing patterns, and whether imports of the relevant parts and components have increased after the initiation of the investigation that resulted in the issuance of the order. 19 U.S.C. § 1677j(a)(3)(A), (C). In this case, Commerce initiated the investigation that resulted in the issuance of the order in 2003. *See Notice of Initiation of Antidumping Duty Investigations: Prestressed Concrete Steel Wire Strand from Brazil, India, the Republic of Korea, Mexico, and Thailand*, 68 Fed.Reg. 9,050 (Feb. 27, 2003). However, instead of examining record evidence pertaining to the entirety of the period between 2003 and 2023, Commerce focused solely on a period starting in July 2018. As Defendants concede, Commerce limited its examination to this truncated period because that is what the petitioners asked it to do. *See* Def.'s Response Br. at 23 (stating that "Commerce based the comparison period and the inquiry period on the request for circumvention inquiry, which alleged that imports of high-carbon steel wire increased starting in 2019."); *see also* IDM at 24 ("We determined the inquiry and comparison periods based on the requestors' suggestion, which was based on when the requestors believed Deacero's circumvention to have begun."). Commerce's willingness to allow the petitioners to decide the inquiry period – and thus to decide which record evidence Commerce would examine – was inconsistent with its obligation to conduct an impartial investigation. *Cf. NEC Corp. v. United States*, 151 F.3d 1361, 1371 (1998) (noting that "{t}he right to an impartial decision maker is unquestionably an aspect of procedural due process" in administrative proceedings) (quoting *FAG Italia S.p.A. v. United States*, 110 F.Supp.2d 1055, 1060 (Fed.Cir. 2000)).

**BUSINESS PROPRIETARY INFORMATION REMOVED** **NON-CONFIDENTIAL VERSION**

Defendant and Defendant-Intervenor do not contest that as a result of Commerce's decision to limit its assessment to the period that the petitioners asked it to examine, Commerce failed to examine the record evidence of the pattern of trade, including sourcing patterns, over the entire history of the order. They also do not contest the existence of the [

], which illustrates the commercial forces driving the level of imports and the pattern of trade – both in 2015, when [

], and in 2021, when the [

]. But as Deacero noted in its opening brief, if Commerce had examined the full period between 2003 and 2023, it would have found that [

]. Deacero Br. at 41 (citing Deacero Case Br. at 24, P.R. 148, C.R. 190).

Defendant and Defendant-Intervenors attempt to defend Commerce's arbitrary and results-driven approach on the grounds that there is no "intent" prong in the statute. [3] *See* Def.'s Response Br. at 23; D-I Response Br. at 16-18. But intent is not the point. Rather, the point is that Commerce failed to do what it is obligated to do: consider the "record as a whole …,

---

[3] Defendant-Intervenor also cites several Commerce determinations in support this argument, none of which are relevant to the facts under consideration here or otherwise helpful to the Defendant-Intervenors' arguments. *See* D-I Response Br. at 17 (citing *Certain Corrosion-Resistant Steel Products From the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed.Reg. 41,957 (July 13, 2020), and accompanying IDM at 13-14 ("China CRS Determination"); *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 Fed.Reg. 70,934 (Dec. 26, 2019) and accompanying IDM at 57-60 ("Korea CRS IDM"); and *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 78 Fed.Reg. 40,101 (July 3, 2013), and accompanying IDM at 7).

First, in each of the determinations, respondents argued that intent was relevant to Commerce's assessment - including that section 781(b)(1)(E) does, in fact, "impl{y} that Commerce must find intent of evasion{.}" *See, e.g.,* China CRS Determination at 10, Korea CRS at 58. As noted above, Deacero is not asserting that Commerce must consider intent. Second, none of the cited determinations involved the specific pattern of trade at issue here – namely, [

]. Third, all of the determinations involved inquiries under section 781(b), not section 781(a).

including evidence that 'fairly detracts from the substantiality of the evidence.'" *DAK Americas LLC v. United States*, 456 F.Supp.3d 1340, 1352 (CIT 2020) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).  Commerce cannot rely on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence," *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F.Supp.3d 1249, 1252 (CIT 2016), nor can it "simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F.Supp. 608, 624 (CIT 1993).

Contrary to the Defendants' and Defendant-Intervenors' assertions, the **[**

**]** is highly material to Commerce's consideration of the pattern of trade, sourcing patterns, and the level of imports.  Deacero imported HCS wire for years as part of its production of PC strand in the United States.  It stopped in **[                                    ]**, and then it resumed its historical patterns.  Commerce's failure to properly account for this evidence violates its obligation to consider "an important aspect of the problem" and renders its determination arbitrary and capricious.  *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court should remand Commerce's determination for reconsideration in light of the full evidentiary record.

## CONCLUSION

Deacero requests that the Court find that Commerce's determinations are unsupported by substantial evidence and otherwise not in accordance with law.  Deacero requests that the Court remand for redetermination consistent with the Court's opinion.

NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Jacob A. Laband
Min Seong Kim

Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for Deacero S.A.P.I. DE C.V. and
Deacero USA, Inc.*

Dated: October 20, 2025

**Court No. 24-00212**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's

Standard Chambers Procedures, the undersigned certifies that this Reply Brief complies with the

word limitation requirement.  The word count, as computed by WilmerHale's word processing

system, is 6,985 words, including footnotes, and excluding the title page, table of contents, table

of authorities, counsel's signature block, and this certificate.


<u>/s/ Stephanie E. Hartmann</u>
(Signature of Attorney)

<u>Stephanie E. Hartmann</u>
(Name of Attorney)

<u>DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC</u>
(Representative Of)

<u>October 20, 2025</u>
(Date)