**PUBLIC VERSION**

Slip Op. 26-56

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DEACERO S.A.P.I. DE C.V. AND DEACERO USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> INSTEEL WIRE PRODUCTS COMPANY, SUMIDEN WIRE PRODUCTS CORPORATION, AND WIRE MESH CORP., <br><br> Defendant-Intervenors. | Before: Joseph A. Laroski, Jr., Judge <br><br> Court No. 24-00212 |

[Denying plaintiffs' motion for judgment on the agency record and sustaining in full the final determination of the U.S. Department of Commerce concerning the anticircumvention inquiry related to the dumping order on prestressed concrete steel wire strand from Mexico.]

Dated: May 26, 2026

Rhonda Kay Schmidtlein and Jacob A. Laband, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, D.C., argued for plaintiffs Deacero S.A.P.I. de C.V. and Deacero USA, Inc.  On the brief were David J. Ross, Stephanie E, Hartmann, Jacob A. Laband, and Min Seong Kim.

An Hoang, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States Government.  With him on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel, arguing for defendant, was Brien Charles Stonebreaker Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.  Of counsel on the brief was Spencer Chase Neff, Office of Chief

Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Elizabeth C. Johnson and Matthew Thomas Martin, Kelly Drye & Warren, LLP, of Washington, D.C., argued for defendant intervenors Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corporation. With them on the brief was Kathleen W. Cannon.

<u>OPINION</u>

Laroski, Judge: The action before the court is a motion for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 filed by plaintiffs Deacero S.A.P.I. de C.V. ("Deacero Mexico") and Deacero USA, Inc. ("Deacero USA") (collectively "Deacero"). Pl. Mot. for J. on the Agency R., ECF Nos. 28–29 (May 19, 2025) ("Deacero Br."). Deacero challenges the U.S. Department of Commerce's ("Commerce") final affirmative determination concerning the anticircumvention inquiry related to the antidumping order on prestressed concrete steel wire strand ("PC strand") from Mexico, conducted pursuant to 19 C.F.R. § 51.226(h) and section 781(a) of the Tariff Act of 1930, as amended ("the Act"), codified at 19 U.S.C. § 1677j(a) and 19 C.F.R. § 351.226(d)(1). See Prestressed Concrete Steel Wire Strand from Mexico, 89 Fed. Reg. 79,252 (Dep't Commerce Sept. 27, 2024) ("Final Determination"), as amended by Prestressed Concrete Steel Wire Strand from Mexico: Final Affirmative Determination of Circumvention of the Antidumping Duty Order, 89 Fed. Reg. 85,844 (Dep't Commerce Oct. 29, 2024), and accompanying Issues and Decision Memorandum ("IDM").

Deacero challenges Commerce's Final Determination on three grounds. Deacero argues that: (1) Commerce's method of comparing Deacero USA's PC

strand production to Deacero Mexico's PC strand production and its inputs is both contrary to the statutory text and legislative history, and inconsistent with Commerce's past practice and record evidence of Deacero's operations; (2) aided by erroneously defining PC strand production process in its comparative methodology, Commerce's analysis of the five factors in section 781(a)(2) of the Act to determine whether processing in the United States is "minor or insignificant" is unreasonable; and (3) Commerce arbitrarily ignored record evidence when considering patterns of trade.  Deacero Br. at 1–42.

Defendant United States ("the Government") and Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members (collectively, "Defendant-Intervenors"), which include Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corporation, maintain that Commerce's conclusions are supported by substantial evidence and otherwise lawful.  See Def. Resp. in Opp'n to Pl. Mot. for J. on the Agency R., ECF Nos. 31–32, at 1 (July 23, 2025) ("Gov. Br."); see also Def.-Int.'s Resp. in Opp'n to Pl. Mot. for J. on the Agency R., ECF Nos. 33–35, at 12 (Aug. 7, 2025) ("DI Br.").

For the forgoing reasons, the court denies plaintiffs' motion and sustains Commerce's Final Determination.

## BACKGROUND

On January 28, 2004, Commerce issued an antidumping duty order on prestressed concrete steel wire strand from Mexico.  Notice of Antidumping Duty

Order: Prestressed Concrete Steel Wire Strand from Mexico, 69 Fed. Reg. 4,112 (Dep't Commerce Jan. 28, 2004) (the "Order").  On June 9, 2023, Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corporation filed a circumvention inquiry request alleging that imports of high carbon steel ("HCS") wire from Mexico that were further processed into PC strand in the United States were circumventing the Order.  Requestors' Letter, "Petitioners' Request for Circumvention Ruling Pursuant to Section 781(a), as Amended," P.R. 1, C.R. 1 (June 9, 2023) ("Circumvention Request").  On July 31, 2023, Commerce initiated a country-wide circumvention inquiry pursuant to section 781(a) of the Act to determine whether imports of HCS wire that are completed or assembled into PC strand in the United States are circumventing the Order for the period of inquiry ("POI") January 1, 2021, through June 30, 2023.  Prestressed Concrete Steel Wire Strand from Mexico: Initiation of Circumvention Inquiry on the Antidumping Duty Order, 88 Fed. Reg. 49,438, P.R. 13 (Dep't Commerce July 31, 2023) ("Initiation Notice").  Commerce initially defined the merchandise subject to the circumvention inquiry as

> HCS wire imported from Mexico. The HCS wire has a high carbon content (*i.e.*, 0.78–0.85 percent), is not heat treated, and has a diameter less than 4.50 millimeters. The HCS wire is assembled or completed in the United States by stranding the HCS wire to produce PC strand of the type that would be subject to the Order.

Initiation Notice, 88 Fed. Reg. at 49,438.  After Deacero "reported that certain of the HCS wire . . . of the type that would be subject to the Order would not fall [within the original scope]," Commerce modified the scope of the inquiry, adjusting the

required level of carbon content from 0.78 percent to 0.60 percent.  Antidumping Duty Order on Prestressed Concrete Steel Wire Strand From Mexico: Preliminary Affirmative Determination of Circumvention, 89 Fed. Reg. 22,668, P.R. 122 (Dep't Commerce Apr. 2, 2024), and accompanying Preliminary Decision Memorandum at 4 n.33 ("Preliminary Determination" or "PDM").

On September 28, 2023, Commerce issued initial questionnaires to the two mandatory respondents, Deacero and Aceros Camesa S.A. de C.V. ("Camesa").[1] PDM at 2.  Deacero timely filed responses on October 6, 2023, and October 30, 2023. Id.  Petitioners submitted comments on November 16, 2023, which Deacero responded to on November 24, 2023.  Id. at 2–3.

On April 2, 2024, Commerce published its preliminary affirmative determination, finding that imports of HCS wire produced in Mexico and assembled or completed into PC strand in the United States were circumventing the Order.  Id. at 21.  Commerce preliminarily found that: (i) the merchandise sold in the United States was of the same class or kind as the merchandise subject to the order; (ii) PC strand sold in the United States was completed in the United States from parts or components produced in Mexico; (iii) the process of assembly or completion in the United States is minor or insignificant; (iv) the value of the parts and components produced in Mexico represent a significant portion of the total value of the PC

---

[1] In its Preliminary Determination, Commerce found that Camesa's U.S. importer sold HCS wire rope in the United States, which is "not of the same class or kind as the class or kind of merchandise subject to the Order" and did not have the ability to produce PC strand.  PDM at 7.  Thus, the requirements of section 781(a)(1)(A) of the Act were not met and further analysis was unnecessary with respect to Camesa and its U.S. importer.  Id.; 19 U.S.C. § 1677j(a)(1)(A).

strand sold in the United States; (v) the patterns of trade and sourcing patterns weighed in favor of an affirmative circumvention determination; (vi) the affiliation between Deacero Mexico and its wholly owned subsidiary, Deacero USA, weighed in favor of an affirmative circumvention determination; and (vii) imports of HCS wire into the United States from Mexico increased following the Order.  Id.

On June 14, 2024, Deacero timely submitted an administrative case brief to Commerce.  Deacero Admin. Case Br. to Commerce, P.R. 148, C.R. 190 (June 14, 2024) ("Deacero Admin. Br.").  Petitioners (here, Defendant-Intervenors) submitted a rebuttal brief on June 27, 2024.  IDM at 2.  On September 20, 2024, Commerce issued its Final Determination, affirming its reasoning and conclusions as reflected in its Preliminary Determination and continuing to find that Deacero's imports of HCS strand produced in Mexico and assembled or completed into PC strand in the United States were circumventing the Order.  Id. at 1.  The court heard oral argument on February 11, 2026.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c).  Under section 1516a(b)(1)(B)(i) of the Tariff Act of 1930, the court will hold unlawful Commerce's determination if it is found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(a)(b)(1)(B)(i).  Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison

Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence requires

"more than a mere scintilla" of evidence.  Id. (quoting Consol. Edison Co., 305 U.S.

at 229).  In addition, "[i]t is well-established that an agency's action must be upheld,

if at all, on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n of

U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) (footnote

omitted) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168

(1962); see SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Am. Textile

Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981)).  "The substantiality of

evidence must take into account whatever in the record fairly detracts from its

weight."  Universal Camera Corp., 340 U.S. at 488; see Nippon Steel Corp. v. United

States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ("A reviewing court must consider the

record as a whole, including that which 'fairly detracts from its weight', to

determine whether there exists 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" (quoting Universal Camera Corp., 340

U.S. at 477–78)).

However, "the [c]ourt will not disturb an agency determination if its factual

findings are reasonable and supported by the record as a whole, even if there is

some evidence that detracts from the agency's conclusion."  Shandong Huarong Gen.

Corp. v. United States, 159 F. Supp. 2d 714, 718 (CIT 2001) (citing Heveafil Sdn.

Bhd. v. United States, 25 CIT 147, 149 (2001)), aff'd sub nom., Shandong Huarong

Gen. Grp. Corp. v. United States, 60 F. App'x. 797 (Fed. Cir. 2003).  Moreover, "the

possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (alteration in original) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)).

A petitioner seeking to challenge Commerce's determination must demonstrate that its preferred evidentiary finding is "the one and only reasonable" outcome on the administrative record, "not simply that [its preferred finding] may have constituted another possible reasonable choice." Tianjin Wanhua Co. v. United States, 179 F. Supp. 3d 1062, 1071 (CIT 2016).

## LEGAL FRAMEWORK

Circumvention inquiries are governed by section 781 of the Act.  19 U.S.C. § 1677j.  Commerce may include imported parts and components that are used in U.S. completion or assembly of subject merchandise within the scope of an AD/CVD order at any time the order is in effect when the merchandise satisfies the criteria under section 781(a)(1) of the Act.  Id. § 1677j(a)(1).

To find circumvention, Commerce must determine that the process of assembly or completion in the United States is "minor or insignificant" as compared to the country subject to the order.  Id. § 1677j(a)(1)(C).  In determining whether the process of assembly or completion is minor or insignificant, Commerce considers five factors: (1) the level of investment in the United States; (2) the level of research and development in the United States; (3) the nature of the production process in the United States; (4) the extent of production facilities in the United States; and, (5)

whether the value of processing performed in the United States represents a small proportion of the value of the merchandise imported into the United States. Id. § 1677j(a)(2). No single factor under section 781(a)(2) of the Act controls. Uruguay Round Agreements Act, Statement of Administrative Action, H.R.Rep. No. 103-316, vol. 1, at 4216 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209 ("SAA");[2] 19 U.S.C. § 1677j(a)(2).

Commerce may include imports of parts or components within the scope of an order at any time the order is in effect if, among other things, the value of the parts and components produced in the foreign country to which the AD/CVD order applies is a significant portion of the total value of the merchandise sold in the United States. Id. § 1677j(a)(1)(D). "In determining whether to include parts or components in a countervailing or antidumping duty order," section 781(a)(3) of the Act provides that Commerce "shall take into account" three additional factors, including: (1) the pattern of trade, including sourcing patterns; (2) whether the manufacturer or exporter of the merchandise is affiliated with the person who uses the merchandise to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States; and (3) whether imports into the foreign country of the merchandise have increased after the initiation of the investigation which resulted in the issuance of such order or finding. Id. § 1677j(a)(3).

## DISCUSSION

---

[2] The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

I.      Commerce reasonably compared Deacero USA's PC strand production
        process to Deacero Mexico's complete production process

Deacero argues that when Commerce determined that Deacero USA's

production process is minor or insignificant, Commerce compared Deacero USA's

production process to Deacero Mexico's overly extensive production process.

Deacero Br. at 1.  Specifically, Deacero contends the complete production process

begins with drawing wire rod, because wire rod is the input, or raw material, for

Deacero's PC strand; and instead, Commerce "erroneously," id. at 33, included wire

rod's production from primary iron and steel inputs into its analysis of Deacero

Mexico's production.  Id. at 1.  According to Deacero, the statutory text and

legislative history, the International Trade Commission's (the "Commission")

description of the PC strand production process, and record evidence of Deacero

Mexico's production process demonstrate that Commerce unreasonably defined the

production process in its comparative analysis and render Commerce's

circumvention determination unreasonable and unlawful.  Id. at 1.

The Government argues that Commerce reasonably compared Deacero USA's

process of stranding HCS wire into PC strand against Deacero Mexico's production

process for PC strand.  Gov. Br. at 12–18.

To determine whether the process of assembly or completion of the inquiry

merchandise in the United States is minor or insignificant pursuant to section

781(a)(1)(C) of the Act, Commerce evaluated the five factors under section 781(a)(2)

as they exist for Deacero USA in comparison to those five factors as they exist for

Deacero Mexico (Commerce's "comparative methodology").  PDM at 9; 19 U.S.C.

§§ 1677j(a)(1)(C), (a)(2).  Deacero USA uses imported HCS wire sourced from its operations in Mexico and strands the wire into PC strand at its sole U.S. facility in Houston, Texas.  PDM at 14.  Deacero Mexico – which is Deacero USA's affiliate and also serves as supplier of the inquiry merchandise (i.e., HCS wire) – operates several facilities in Mexico, across which, it "perform[s] all aspects of PC strand production," id. at 13 (citing Response of Deacero to the Department's Jan. 12, 2024 Supplemental Questionnaire at 15–17, P.R. 95–97, C.R. 65–159 (Feb. 5, 2024) ("SQR")), including the production of wire rod from primary iron and steel inputs, wire drawing, and the final PC stranding operations (referred to by Commerce as a "vertically integrated" or "complete" production process or "entire manufacturing process").  Id.

Commerce reasonably assessed Deacero's production operations because (A) the comparative methodology is consistent with the statute; (B) Commerce reasonably explained why it considered Deacero Mexico's operations to be "vertically integrated"; and (C) Commerce is not bound by ITC descriptions of the PC strand production process.

### A. Commerce's comparative methodology is consistent with the statute's text and legislative intent

#### (i)     Plain language

Deacero argues that the statutory text of section 781(a) of the Act does not support Commerce's decision to compare its PC strand production in the United States to a "complete production process"[3] in Mexico that includes the production of

---

[3]  Neither the statute nor its legislative history use or define "complete production process."

the parts or components of PC strand (i.e., wire rod) from primary iron and steel inputs (i.e., steel billets and scrap).  Deacero Br. at 1.  While this comparison method has been upheld in the context of section 781(b) of the Act for a process of assembly or completion in a third country, Deacero contends that Congress deliberately drafted sections 781(a) and (b) of the Act as separate provisions to reflect the differences between inquiries into the production processes in the United States versus those in foreign countries.  Id. at 13–14.  According to Deacero, applying a comparative methodology upheld under section 781(b) of the Act in the section 781(a) context is inconsistent with Congress's deliberate textual and structural distinctions.  Id.

The Government argues that sections 781(a) and 781(b) of the Act are "structurally similar, imposing the same general requirements with only minor differences to account for further assembly in the United States as opposed to a foreign country."  Gov. Br. at 14 (comparing 19 U.S.C. § 1677j(a) with § 1677j(b)).  The Government contends that under either provision, the statute enables Commerce to "compar[e] a process of assembly or completion in the United States against a more comprehensive process of manufacture outside the United States."  Id. at 13.

> In its Preliminary Determination, Commerce explained that
>
> [c]omparing the entire production process for PC strand [i.e. including the production of wire rod from primary iron and steel inputs] against the production process for finishing HRS wire into PC strand is reasonable in the circumvention context because it is relevant to whether a producer would reasonably move its further processing across borders to avoid the discipline of an order.

PDM at 15.  Commerce did not alter its methodology for its Final Determination

and explained that its comparison of the production process in the United States to

the entire manufacturing process in the subject country (i.e., Mexico) was consistent

with its "established practice," as judicially affirmed in the context of section 781(b)

of the Act.  IDM at 12, 12 n.59 (citing Certain Corrosion-Resistant Steel Products

from the People's Republic of China: Affirmative Final Determination of

Circumvention Involving the United Arab Emirates, 85 Fed. Reg. 41,957 (July 13,

2020) (comparing the production process for CORE in the UAE with the integrated

steel mill production in China), upheld, Al Ghurair Iron & Steel LLC v. United

States, 536 F. Supp. 3d 1357, 1368 (CIT 2021) (Al Ghurair I), aff'd, 65 F.4th 1351

(Fed. Cir. 2023) (Al Ghurair II)).

Commerce's definition of the complete production process for PC strand is

consistent with the statute.  See 19 U.S.C. § 1677j(a).  Neither the statute, nor its

legislative history, prescribe a method Commerce must adopt in either the 781(a) or

781(b) context to compare the production processes in the subject country with the

United States or a third country.  Sections 781(a) and (b) of the Act share the title

"Determination of Whether Process Is Minor or Insignificant" and both require

Commerce to analyze the same five factors to determine whether the production

process is "minor or insignificant."  Compare 19 U.S.C. § 1677j(a)(2) with

§ 1677j(b)(2).  The only distinction between each section's five factors is when the

factors refer to the location of completion or assembly.  Section 781(a) of the Act

refers to, for example, "the level of investment in the United States," id.

§ 1677j(a)(2)(A), while section 781(b) refers to "the level of investment in the foreign country."  Id. § 1677j(b)(2)(A).

Deacero's argument that because the text of the statute is different in sections 781(a) and 781(b) of the Act, Commerce cannot choose methodology to compare production processes in the home country to the processes in the other relevant country is inapposite – the text does not state such mandate.  Id.  Thus, based on the statute's plain text, Commerce reasonably relied on having used a similar comparative methodology in the section 781(b) context when it chose to include the production of wire rod from primary iron and steel inputs in its analysis of Deacero Mexico's complete production process for PC strand.  See PDM at 11–12; IDM at 12–17.[4]

### (ii)    Legislative Intent and Purpose

Deacero argues that Commerce cannot lawfully rely on section 781(b) precedent to justify its comparative methodology because section 781(a) of the Act "reflects unique congressional intent and purpose."  Deacero Br. at 19; see id. at 14–19 (referencing SAA at 893–94; S. Rep. No. 103-412, at 81–82).  Deacero contends that Congress was most concerned about importers circumventing AD/ CVD orders through "screwdriver assembly operations"[5] in the United States.  Id. at 15 (quoting

---

[4]  See PDM at 11 n.69, 70 for circumvention inquiries in which Commerce used an integrated production process of the merchandise to determine whether production in the United States or a third country was minor or insignificant.

[5]  In a "screwdriver assembly operation" the producer relies on off the shelf components and circumvents an antidumping duty order "by establishing a screwdriver operation in the United States that purchases as many parts as possible from a third country."  SAA at 893.

SAA at 893).  Deacero does not identify its operation as a "screwdriver operation,"

id., and, if permitted,

> Commerce's methodology will expand the scope of orders on downstream
> steel products to include all imported intermediate steel products,
> because the scale of investment in the United States for any given
> downstream product will rarely be comparable to the cost of a process
> that includes the investment value of a steel mill that creates the
> primary iron and steel inputs.

Id. at 14.  Deacero argues that such an outcome "undermines congressional intent to

protect legitimate investment in the U.S.,"[6] Deacero Reply at 4, and thus,

Commerce's method under section 781(b) of the Act cannot be intended to apply to a

section 781(a) inquiry.  See id.; see also Deacero Br. at 17 ("The purpose of the

provision is to properly address circumvention while, at the same time, ensuring

that anticircumvention inquiries 'will not deter legitimate investment,

characterized by the addition of substantial value.'") (referencing SAA at 894).

        According to the Government, the legislative history confirms that Commerce

has flexibility in applying the provisions when defining the production process.

Gov. Br. at 13–14.  The SAA, "leaves the choice of methodology within Commerce's

discretion, providing that Commerce will evaluate § 1677j(a)(2) factors 'depending

---

[6] Deacero invokes Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024), arguing that the "best reading" of section 781(a) of the Act would focus on protecting legitimate investment and as such Commerce's comparative methodology should analyze the "actual production process for the subject merchandise from the relevant parts and components, not the production of the parts and components themselves." Deacero Reply at 3–4 (citing Loper Bright, 603 U.S. at 400).  The question before this court is not how to interpret an ambiguous statutory provision; it is whether Commerce's method is supported by substantial evidence and in accordance with law.  The statute's plain language directs Commerce to conduct a fact-specific inquiry, and its legislative history repeatedly affirms the flexibility Commerce enjoys in conducting its circumvention analysis.  Deacero goes as far as to invoke Skidmore deference, id. at 12 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140, (1944)), but this argument also fails given record evidence of Commerce's past practice of using an integrated production process for comparison and its thorough explanation for choosing to do the same with respect to Deacero Mexico's production.

on the particular circumvention scenario.'" Id. at 13 (quoting SAA at 893) (citing

Timken Co. v. United States, 968 F. Supp. 2d 1279, 1286 n.7 (CIT 2014), aff'd, 589

F. App'x 995 (Fed. Cir. 2015) (When a statute "places no other limits on the

methodologies that Commerce may employ . . . it leaves Commerce discretion as to

the choice of methodologies.") (citation modified).  The Government contends that

the SAA's reference to "screwdriver assembly operations" is merely illustrative and

does not evince an intent to narrow the statute.  Id. at 15.

The legislative history does not support Deacero's distinction between

sections 781(a) and 781(b) of the Act, such that a comparative method under one

provision would be unreasonable or unlawful if applied to an inquiry under the

other.  First, when addressing the multi-factor tests for whether assembly or

completion is minor or insignificant, both the SAA and the Senate Report address

sections 781(a) and (b) in conjunction, listing out the shared factors.  See, e.g., SAA

at 893–94 ("New sections 781(a)(2) and 78l(b)(2) list the following factors [the five

minor and insignificant factors respectively].");  S. Rep. No. 103-412, at 82 ("781(a)

and (b) require Commerce to consider whether . . . .").  Second, Deacero

unreasonably attempts to limit anticircumvention inquiries to "screwdriver

assembly operations."  See Deacero Br. at 14–15.  With respect to "screwdriver

assembly operations" specifically, the SAA states:

> Another serious problem is that the existing statute does not deal
> adequately with the so-called third country parts problem.  In the case
> of certain products, particularly electronic products that rely on many
> off the shelf components, it is relatively easy for a foreign exporter to
> circumvent an antidumping duty order by establishing a screwdriver
> operation in the United States . . . .

SAA at 893.  The SAA's language, such as "for example" and "another serious problem," demonstrates that the Act's anticircumvention purpose is not limited to "screwdriver operations."  Id.; see Hanon Sys. Ala. Corp. v. United States, 794 F. Supp. 3d 1348, 1357 (CIT 2025) (rejecting the contention that the SAA limits the circumvention statute to "screwdriver assembly operations").

Third, the SAA refers to legitimate investment in the context of operations "in the United States or in third countries."  SAA at 894.[7]  Accordingly, concerns regarding legitimate investment apply to inquiries under both sections 781(a) and 781(b) of the Act.  Thus, Deacero's characterization regarding Congress's concern for protecting legitimate investment, as discussed in the SAA, cannot serve as a basis for determining Commerce's comparative methodology is unreasonable.  See 19 U.S.C. §§ 1677j(a), (b).

Absent statutory language and legislative history directing otherwise, Commerce reasonably defined Deacero Mexico's production process and properly invoked past practice, as judicially affirmed in the context of section 781(b) of the

---

[7] Deacero contends that its production process in the United States resembles that of other domestic producers, including petitioners (now Defendant-Intervenors).  Deacero Br. at 30, 34.  However, Deacero concedes that "[[                                             ]]  purchase Mexican origin wire rod to make PC strand," id. at 34, while Deacero imports HCS wire (i.e., wire rod that has already undergone the drawing process).  Id. at 1–2.  The statute also does not direct Commerce to evaluate domestic producers.  See Alloy and Certain Carbon Steel Threaded Rod From the People's Republic of China, 89 Fed. Reg. 68,586 (Dep't Commerce Aug. 27, 2024), and accompanying Issues and Decision Memorandum at 12 ("The respondents . . . contend that Commerce wrongly compared the cost of building and operating a steel mill to the cost of threading to reach its conclusion that threading pins into steel threaded rod constitutes minor or insignificant processing; specifically, they assert that such a comparison is improper because 'no one in the domestic industry producing steel threaded rod . . . owns or operates a steel mill.'  This is an incorrect characterization of the method by which Commerce assessed the relative value of the processing that takes place following importation of unthreaded pins.")

Act, to explain its decision to compare Deacero USA's PC strand production to Deacero Mexico's complete production process.

## B. Commerce properly compared Deacero USA's PC strand production to Deacero Mexico's vertically integrated production process

### (i) The Commission's description of the production process

As evidence that Commerce erred in defining production processes for its comparative methodology, Deacero argues that Commerce arbitrarily departed from an established practice of relying on the Commission's description of the subject merchandise's production process. Deacero Br. at 21–24 (citing e.g., Certain Uncoated Paper from the People's Republic of China: Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls, 85 Fed. Reg. 72,624 (Dep't Commerce Nov. 13, 2020) ("Certain Uncoated Paper"), and accompanying Preliminary Decision Memorandum at 9 (determining that to support the assertion that the subject-paper rolls as entered had all the necessary raw materials for uncoated paper sheets, the petitioners "provided a brochure illustrating [the] production process and the ITC Final where the ITC described the production process of uncoated paper sheets"); Ferrovanadium and Nitrided Vanadium From the Russian Federation: Negative Final Determination of Circumvention of the Antidumping Duty Order, 77 Fed. Reg. 46,712 (Dep't Commerce Aug. 6, 2012) ("Ferrovanadium and Nitrided Vanadium"), and accompanying Issues and Decision Memorandum at 8 (determining, in accordance with the corresponding ITC investigative report, that

the "processing of Russian vanadium pentoxide into ferrovanadium involves significant operations").

Here, the Commission describes PC strand production as consisting of four stages: drawing wire rod, stranding, stabilizing, and packaging.  See ITC description in Final Investigation Report (January 2021) at I-16.  Had Commerce used the Commission's description, Deacero contends, Commerce would have found that Deacero USA performs three of the four steps in the PC strand production process (all but the drawing of wire rod into HCS wire), and therefore, its production is not minor or insignificant relative to its wire drawing and PC strand operations in Mexico.  Deacero Br. at 33.

The Government acknowledges that Commerce's description of the production process may overlap with the Commission's description, but argues that Commerce does not have "a practice of substituting its own findings with those of the [Commission]."  Gov. Br. at 17 (citing IDM at 17 (citing Light-Walled Rectangular Pipe and Tube from the People's Republic of China, 88 Fed. Reg. 77,283 (Dep't Commerce Nov. 9, 2023) ("LWRPT"))).  Instead, Commerce's practice is to "rely on the complete production process."  Id. (quoting IDM at 15).

Deacero's argument that Commerce is bound by the Commission's description of the production process to examine whether a respondent's production process in the United States is minor or insignificant is without merit.  Commerce addressed Deacero's concern in its Final Determination and reasonably explained that it "has a longstanding practice of evaluating the entire manufacturing process as part of its

circumvention inquiry analysis, for steel and non-steel products, in determining

whether a process of assembly or completion is minor or insignificant." IDM at 13

(citations omitted).  Furthermore, Commerce's comparative methodology has been

upheld by this court and affirmed by the Federal Circuit.  See e.g., Al Ghurair I 536

F. Supp. 3d at 1368, aff'd, Al Ghurair II, 65 F.4th at 1354.

The circumvention inquiries Deacero relies on as evidence of Commerce's

purported long-standing practice to rely on the Commission's production process

definitions demonstrate, at best, that either Commerce has used Commission

reports to substantiate factual premises, or that a Commission description of the

production process has coincided with Commerce's description.  See e.g., Certain

Uncoated Paper, 85 Fed. Reg. at 72,624; Ferrovanadium and Nitrided Vanadium,

77 Fed. Reg. at 46,712.

Past practice, instead, indicates that Commerce already rejected any notion

that the Commission description supersedes or replaces its fact-finding and

supports Commerce's decision to include the production of PC strand inputs when

conducting its inquiry.  In LWRPT, Commerce explained that

> [w]hile ITC reports are useful for determining minor finishing processes
> for the completion of subject merchandise, regarding the pipe industry,
> steel pipe must be produced from steel coil (e.g., HRS).  Thus, to
> determine if entities are circumventing the order, it is reasonable for
> Commerce to consider the production process that began in the subject
> country.  The manufacturing process described in ITC reports, which
> were issued in a different context for different purposes, are not binding
> to Commerce's circumvention analysis, nor do they encompass the entire
> manufacturing processes required to produce subject merchandise from
> the beginning stages.

LWRPT at 43.[8]  Thus, the fact that Commerce compared Deacero USA's PC strand

production to a process in Mexico that is more extensive than the Commission's

description does not render Commerce's methodology unreasonable or its

determination unsupported by substantial evidence or otherwise unlawful.

### (ii)    Vertically integrated production process

As additional evidence that Commerce acted unreasonably in applying its

comparative methodology, Deacero contends that none of its facilities in Mexico

perform all the steps required to produce PC strand from primary iron and steel

inputs.  Hence, Deacero Mexico's operations are not "fully integrated," and cannot

constitute a "complete production process" for Commerce's analysis.  Deacero Br. at

15–17.  Instead, Deacero insists Commerce should have limited its comparison of

Deacero USA's PC strand operations to the wire drawing and PC strand operations

performed at one of its facilities in Mexico.  See id. at 16.[9]

According to the Government, Commerce properly determined that Deacero

Mexico's facilities were "vertically integrated."  Gov. Br. at 16.  The Government

argues that, in determining whether production is vertically integrated for the

---

[8]  Commerce need not be entirely consistent with past practice as it is not bound by prior determinations.  See Hyundai Elec. & Energy Sys. Co. v. United States, 15 F.4th 1078, 1089 (Fed. Cir. 2021) ("We have rejected the notion that Commerce is forever bound by its past practices. Instead, each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."); see also Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").
[9]  Like Deacero USA's facility in Houston, Texas, Deacero's facility in Morelia, Mexico, "does not produce its own wire rod; rather, it sources wire rod either from Deacero's Celaya facility, from [[

]]."    Deacero Br. at 16 (citing Deacero Comments on Petitioners' Request for Circumvention Ruling at 13, P.R. 22, C.R. 10 (Sept. 6, 2023)).

purposes of a circumvention inquiry, "[t]he relevant question driving the use of Commerce's comparative methodology is 'whether a producer would reasonably move its further processing across borders to avoid the discipline of an order.'" Id. (citing IDM at 15).  As the Government explained with respect to Deacero, "[a] foreign producer with multiple factories, which supply each other with inputs, and which are each owned by the same overall parent would be able to move its production process across borders, regardless of the factories' locations."  Id.

Commerce reasonably determined that Deacero's production process was vertically integrated for the purpose of its comparative methodology.  In its Preliminary Determination, Commerce explained that while "Deacero's actual level of integration is not dispositive in our analysis," record evidence nonetheless indicates that Deacero Mexico is vertically integrated.  PDM at 12–13 (citations omitted).  When the respondent operates multiple facilities, Commerce noted, integration does not depend on whether each step in the production process takes place at a single facility; rather, it depends on whether there is "a common ownership and supply of inputs between the facilities."  Id. at 14.  Commerce considered record evidence submitted by Deacero, which, according to Commerce indicated that "during both the comparison and inquiry periods, it operated facilities in Mexico that perform all aspects of PC strand production, from steel melting, casting, hot rolling, wire drawing and the final PC stranding operations."  Id. at 13.  Commerce thus reasonably determined "[t]he fact that Deacero [Mexico] produces PC strand in its Morelia facility from (in part) wire rod produced in its

Celaya facility, is sufficient to consider its operations vertically integrated." Id. at

14.

Furthermore, Commerce's definition of "vertically integrated production" is

consistent with past practice judicially affirmed by this court.  See e.g., Al Ghurair I

536 F. Supp. 3d at 1368, aff'd, Al Ghurair II, 65 F.4th 1351 (affirming the

comparison to integrated steel mills because "the statute does not outline a specific

methodology for Commerce to determine whether the level of investment is minor or

insignificant").

II.     **Commerce's determination that Deacero USA's production process is
        minor or insignificant is supported by substantial evidence and otherwise
        lawful**

Section 781(a)(2) of the Act requires Commerce to weigh five factors, based on

a totality of the circumstances, to determine whether Deacero USA's process of

production or assembly of PC strand from Mexican-origin HCS wire is minor or

insignificant.  19 U.S.C. § 1677j(a)(2).  Deacero argues that Commerce's "erroneous

[comparative] methodology infects Commerce's analysis of each of the five factors."[10]

Deacero Br. at 2.

The Government argues that rather than engage with the merits of

Commerce's factual determinations, Deacero merely "argues what Commerce

should have done had it adopted Deacero's preferred analytical framework."  Gov.

Br. at 19 (citing Luoyang Bearing Factory v. U.S., 26 C.I.T. 1156, 1173 (CIT 2002)

---

[10]  Deacero's argument that Commerce erred in comparing its production of PC strand in the United
States to an integrated process in Mexico that includes the production of PC strand from primary
iron and steel inputs have been addressed in Section I and will not be repeated here.

("[A] party 'may not usurp Commerce's role as fact-finder and substitute [Deacero's] analysis for the result reached by Commerce.'")).[11]

All five factors are at issue: (A) level of investment; (B) research and development; (C) nature of the production process; (D) extent of production facilities; and (E) value of the processing performed in the United States. 19 U.S.C. §§ 1677j(a)(2)(A)–(E).

## A. Level of investment in the United States

Deacero contends that Commerce ignored record evidence of significant U.S. investments, which, if properly considered, should have weighed against a finding that Deacero USA's level of investment is minor or insignificant. Deacero Br. at 31. For example, Deacero notes that it invested approximately [[          ]] for its PC strand production at its facility in the United States. Id. (citing Prelim. Analysis Memo at 4).

The Government responds that rather than contest the merits of Commerce's findings, Deacero simply asserts that its investments in its sole U.S. facility "weigh against a finding that its U.S. process is minor or insignificant." Gov. Br. at 19 (citing Deacero Br. at 31).

---

[11] The Government argues that Deacero has inadequately challenged Commerce's findings and thus its arguments should be deemed waived. Gov. Br. at 19 citing United States v. Great Am. Ins. Co., 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."). This court disagrees. Deacero contests Commerce's use of a complete production process for PC strand that includes the production of wire rod. According to Deacero, Commerce's "erroneous methodology infects Commerce's analysis of each of the five factors underlying its determination that Deacero's PC strand production process in the United States is 'minor or insignificant.'" Deacero Br. at 2. In its Reply, Deacero reiterates that Commerce ignored record evidence, that "when evaluated against these five factors, demonstrates that Deacero is not engaged in circumvention and that Deacero USA's PC strand production process resembles that of other U.S. PC strand producers." Deacero Reply at 19. Thus, this court finds that Deacero has not waived its arguments.

In its Preliminary Determination, Commerce explained that because Deacero only performs the final stages of PC strand production in the United States, it was "appropriate to compare the investment by Deacero USA in PC strand production in the United States to the investment in the integrated production process of HCS wire at Deacero's integrated steel mill in Mexico." PDM at 10 (citing Prelim. Analysis Memo at 3–5). Accordingly, Commerce compared the value of investment required to restart PC strand production in 2021 at Deacero USA's Houston facility with the investment required for the entire production process in Mexico.[12] Id. From the evidence Deacero submitted, Commerce determined that "Deacero's level of investment in the United States used to complete the production of PC strand from Mexican-origin HCS wire is minor compared to the level of investment, both in terms of initial capital and equipment, required in Mexico to produce HCS wire from basic inputs." Id. at 15.

In its Final Determination, Commerce affirmed its finding and responded to Deacero's concern that Commerce had overlooked evidence of investments made in other operations in the United States. IDM at 18. Commerce explained that investments unrelated to Deacero's PC strand production were "irrelevant" to its circumvention analysis. Id.

Commerce reasonably determined that the level of investment in the United States weighed in favor of a finding that the process of assembly or completion in the United States is minor or insignificant. In its Preliminary Determination,

---

[12] By "restart" Commerce refers to the investment needed to resume PC strand production in the United States [[                                                                    ]].

Commerce thoroughly explained the relevance of considering the level of investment for an integrated production process in Mexico. PDM at 11–15. In its Final Determination, Commerce reiterated the rationale for applying its comparative methodology. IDM at 14–15. Likewise, Commerce addressed and rejected Deacero's concern that Commerce had impermissibly ignored evidence of significant investments in making its finding, explaining that "these investments are not related to the production of PC strand and are, therefore, irrelevant to our analysis." Id. at 18.

### B. Research and development in the United States

Deacero contends Commerce unreasonably concluded that the level of research and development ("R&D") at its facility in Houston weighed in favor of an affirmative circumvention finding despite record evidence that neither its U.S. nor its Mexican facilities expended a significant amount on R&D. Deacero Br. at 31–32 (citing IDM at 17–19). Deacero argues that Commerce's analysis is inconsistent with its approach towards other section 781(a)(2) factors such as level of investment, nature of the production process, and extent of production facilities. Id. Deacero asserts that Commerce analyzes those factors as they exist in the United States and makes a comparison to the factors as they exist in the home country. Id. Had Commerce evaluated R&D on relative terms, the comparable R&D expenditures between Deacero USA and Deacero Mexico should have weighed against a minor or insignificant finding. Id.

The Government rejects Deacero's characterization of Commerce's analysis. According to the Government, Commerce did compare the level of R&D in the

United States to that in Mexico, from which it concluded that Deacero USA's expenditures were minor. Gov. Br. at 20–21 (citing IDM at 18). Commerce's finding was based on Deacero's own reporting that it [[

]]  at its U.S. facility and [[                          ]]  at its Mexican facility. Id. at 6–7 (citing Prelim. Analysis Memo at 5), 21.

In its Preliminary Determination, Commerce found that the minimal R&D at Deacero USA's Houston facility weighed in favor of finding that assembly or completion was minor or insignificant. PDM at 15. In its Final Determination, Commerce rejected Deacero's argument that the low amount of R&D across both its U.S. and Mexico operations weighed against the affirmative finding. IDM at 18. Commerce reaffirmed that "low levels of R&D weigh in favor of finding the process of assembly or completion to be minor or insignificant." Id. (citing Prelim. Analysis Memo at 6 (citations omitted)).

Both Commerce's analysis of R&D and its conclusion that Deacero USA's level of R&D weighed in favor of a finding that assembly or completion was minor or insignificant are reasonable. Deacero seemingly argues that because R&D is negligible in both its U.S. and Mexican facilities, Commerce should not have determined that this factor weighed in favor of a finding that Deacero USA's production is minor or insignificant. Nothing in the statute or its legislative history directs Commerce to analyze R&D in such a way. Additionally, as Commerce indicated in its Final Determination, its analysis is consistent with past practice. See, e.g., Antidumping and Countervailing Duty Orders on Certain Collated Steel

Staples from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to the Kingdom of Thailand and the Socialist Republic of Vietnam, 88 Fed. Reg. 57,931 (Dep't Commerce Aug. 24, 2023), and accompanying Preliminary Decision Memorandum for Vietnam at 20 (finding that the lack of R&D expenditures reported by the respondent in a section 781(b) inquiry weighed in favor of a finding that assembly or completion in the third country was minor or insignificant); Carbon and Alloy Steel Threaded Rod from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders, 89 Fed. Reg. 18,600 (Dep't Commerce Mar. 14, 2024), and accompanying Preliminary Decision Memorandum at 13 (finding that respondent reported zero costs for R&D in a section 781(a) inquiry and so this factor weighed in favor of a determination that assembly or completion in the United States was minor or insignificant). Therefore, Commerce reasonably considered record evidence that Deacero USA and Deacero Mexico incurred minimal expenses for R&D, as well as its own past practice, to conclude that this factor weighed in favor of a finding that the process of assembly or completion in the United States was minor or insignificant.

### C. Nature of the production process in the United States

According to Deacero, Commerce's determination that Deacero USA only performs the "final stages" in PC strand production is based on an erroneous definition of the production process. Deacero Br. at 34 (quoting PDM at 14; IDM at 18). Of the four steps in PC strand production described by the Commission (drawing, stranding, stabilizing, and packaging), record evidence shows that

Deacero USA's Houston facility performs all but the drawing step, which Deacero contends is "relatively unsophisticated and minor." Id. at 33. Deacero argues that Commerce's unreasonable comparative methodology has broader negative implications because "[m]ost if not all of the domestic producers" do not produce PC strand from primary iron or steel inputs. Id. at 34.[13]

The Government argues that Deacero "dramatically overstates," Gov. Br. at 20, Commerce's finding because in addition to the nature of the production process, Commerce considers four other factors under section 781(a)(2) of the Act and additional factors under section 781(a)(3) of the Act. Id. (citing 19 U.S.C. §§ 1677j(a)(2)–(3)). In response to Deacero's point that several domestic producers purchase Mexican-origin wire rod for PC strand production, the Government contends that Deacero has not "articulate[d] what bearing that finding should have on Commerce's finding." Id.

In Al Ghurair I, the court clarified that when evaluating the reasonableness of Commerce's inquiry into the nature of the production process "[t]he statute does not direct the court to evaluate the number of stages involved in a production process." Al Ghurair I, 536 F. Supp. 3d at 1371, aff'd, Al Ghurair II, 65 F.4th at 1361 (citing 19 U.S.C. § 1677j(b)(2)(C)). As this court recognized, "a seemingly extensive operation may nonetheless be minor in the context of the overall process of manufacturing a product — depending on the nature of that product." Id.

---

[13] As previously indicated, Deacero's argument that Commerce's finding is "overbroad" is unavailing. Deacero has not stated that the statute's plain language or its legislative history requires Commerce to consider domestic producers.

(citation modified) (citation omitted).  Thus, Deacero's suggestion that because three

of the four steps for PC strand production – according to the Commission's

description – are performed in the United States, the nature of Deacero USA's

production process cannot be considered minor or insignificant, is unavailing.

In support of its preliminary finding about the nature of the production

process in the United States, Commerce observed Deacero USA's production process

converting HCS wire into PC strand, which involves: a stranding machine used to

wind HCS wires; the twisted steel cable is stabilized and tensioned, and then wound

on a jumbo metal coiler; a sample from each jumbo coil is inspected and tested at an

on-site laboratory; and jumbo coils are rewound into smaller coils and prepared for

delivery.  PDM at 16 (citations omitted).  For comparison, Commerce considered the

production across three of Deacero's facilities in Celaya, Mexico, which includes: the

collection and sorting of scrap; scrap is melted for production of billets produced in

Deacero's steel mill; billets are rolled into wire rod; HCS wire rod undergoes a

drawing process to be converted into HCS; and PC strand is wound and stabilized

from the HCS wire.  Id.  Commerce preliminarily determined

> [g]iven that Deacero USA's production stages . . . only involve processing
> the HCS wire into PC strand (rather than also making the HCS wire
> from wire rod and/or the wire rod from basic inputs), . . . the nature of
> Deacero USA's production process in the United States weighs in favor
> of finding that the process of assembly or completion in the United
> States is minor or insignificant.

> Id.

In its Final Determination, Commerce rejected Deacero's contention that, had

Commerce limited its comparison with Deacero Mexico's operations to the four steps

described by the Commission, Commerce would have found that Deacero USA performs three of the four which would have weighed against Commerce's affirmative finding. IDM at 18–19. Commerce reiterated its basis for comparing Deacero USA's level of production to Deacero Mexico's complete production process. Id. at 12–17.

Notwithstanding Deacero's assertion that it performs most of the steps to produce PC strand as described by the Commission in the United States, Commerce reasonably explained the basis for including Deacero Mexico's production of wire rod. See id. at 18–19. Based on record evidence, Commerce reasonably found that Deacero USA only performed the final stages in PC strand production, which weighed in favor of finding that assembly or completion in the United States was minor or insignificant.

### D. Extent of production facilities in the United States

Deacero contends that Commerce erred by including Deacero Mexico's "facilities and machines . . . for the production of billets, wire rod, and wire products" in its comparative methodology. Deacero Br. at 35 (quoting PDM at 16–17; IDM at 19). Deacero argues that its operations in Mexico are "relatively less complex" than those it conducts in the United States, and its facilities are also used to produce other products aside from PC strand. Id. at 36. Deacero reiterates that the only step of PC strand production not performed in the United States is the drawing stage which it describes as relatively "rudimentary and preparatory"; whereas the remaining steps are "significantly more complex and capital intensive," and "impart the essential character" to the PC strand. Id. at 35.

In response, the Government reiterates that Deacero cannot usurp Commerce's role as factfinder.  Gov. Br. at 19 (citing Luoyang, 26 C.I.T. at 1173).

In its Preliminary Determination, Commerce considered evidence supplied by Deacero USA regarding its number of workers, the size of its Houston facility, a list of assets required for its PC strand production, and its annual production capacity. PDM at 16.  For Deacero Mexico, Commerce considered evidence of the number of workers, the size of its several facilities in Mexico, a list of assets, and the production capacity for PC strand, HCS wire, wire rod, and steel billets.  Id. at 16–17; Prelim. Analysis Memo at 8–9 (citation omitted).  Commerce preliminarily determined that the extent of Deacero USA's production weighed in favor of a finding that assembly or completion in the United States was minor or insignificant. PDM at 16–17.

In its Final Determination, Commerce rejected Deacero's contentions that given the comparable PC strand production capacity between Deacero USA and Mexico, as well as the fact that Deacero USA's facility is also used for producing products other than PC strand, the "extent of production facilities" factor supports a negative determination.  IDM at 19.  Commerce explained that the production of other products at Deacero USA's facilities was irrelevant for the purposes of Commerce's analysis.  Id.  Additionally, Deacero's evidence of comparable PC strand production capacity overlooked "its facilities and machines in Mexico for the production of billets, wire rod, and wire products" (i.e., the extent of production for an integrated PC strand production process).  Id.  Commerce continued to find that

the extent of production facilities in the United States weighed in favor of a finding

that the process of assembly or completion in the United States was minor or

insignificant.  Id.  Commerce reasonably conducted its fact-finding, explained the

record evidence that factored into its analysis, and responded to Deacero's concerns

in its Final Determination.

### E.  Value of the processing performed in the United States

Deacero argues that Commerce miscalculated the value added by Deacero

USA's processing to the value of the merchandise.  Deacero Br. at 36.  According to

Deacero, when Commerce added Deacero USA's reported costs for "direct materials,

direct labor, factory overhead, packing, selling, general and administrative expenses

(SG&A), and net interest expense" to the value of the imported HCS wire,

Commerce undervalued Deacero USA's process to transform the imported HCS wire

into PC strand.  Id. (citing Prelim. Analysis Memo at 10; IDM at 20).  Deacero notes

that Commerce calculated the value of HCS wire Deacero USA imports from Mexico

as [[    ]]  percent of the total value of the PC strand Deacero sells in the United

States.  Id. at 36–37.  Consequently, Deacero contends that the value of Deacero

USA's processing of Mexican-imported HCS wire into PC strand must be closer to

[[ ]]  percent, not the much smaller percentage Commerce found ([[    ]]  percent)

(i.e., the sum of the value added by Deacero USA's processing and the value of HCS

wire should equal 100 percent).  Id.

The Government argues that Commerce calculated the value of Deacero

USA's processing and its Mexican-imported HCS wire under different statutory

provisions.  Gov. Br. at 21–22 (referring to 19 U.S.C. §§ 1677j(a)(1)(D), (2)(e)).

According to the Government, values calculated pursuant to different statutory provisions need not equal 100 percent as Deacero suggests.  Id.

Defendant-Intervenors add that "[t]he statute does not provide any specific methodology for Commerce to follow in making this calculation."  DI Br. at 15. Furthermore, Defendant-Intervenors contend that Commerce's calculation method is consistent with Hanon, in which this court "upheld as 'reasonable' a calculation for third-country processing value which added to the cost of production 'labor, fixed and variable overhead, selling, general, and administrative items, and interest, and divided the sum by the per-unit weighted-average value of the mandatory respondents' U.S. sales of inquiry merchandise.'"  Id. at 15–16 (citing Hanon 794 F. Supp. 3d at 1362).

To calculate the value added to the imported HCS wire through processing in the United States, Commerce summed the per-unit, weighted-average costs for labor, factory overhead, and packing for the inquiry period, and divided the sum by the per-unit, weighted-average value of Deacero USA's sales of inquiry merchandise in the United States during the inquiry period.  PDM at 17.  Commerce preliminarily found that the value of processing performed by Deacero USA represented a small percentage of the value of the PC strand sold in the United States, which weighed in favor of a finding that the process of assembly or completion in the United States was minor or insignificant.  Id. at 18.

In its Final Determination, Commerce repudiated Deacero's concern that its calculations implicitly inflated the value of imported HCS wire.  Commerce

explained that section 781(a)(2)(E) of the Act values the processing performed, not the value of the HCS wire itself.  IDM at 20.  Moreover, Commerce emphasized that its calculations were made "based only on Deacero's self-reported costs for labor, factory overhead (direct and indirect), and packing" and were consistent with calculations in prior circumvention inquiries.  Id. at 20 n.114 (citations omitted).  Commerce continued to find that the value of the processing performed in the United States "is a small proportion of the value of the merchandise sold in the United States, weighing in favor of finding that the process of assembly or completion in the United States is minor or insignificant."  Id. at 20; see 19 U.S.C. § 1677j(2)(e).

Commerce's approach was reasonable, and its determination is supported by substantial evidence.  See Al Ghurair I, 536 F. Supp. 3d at 1374–75 (citing Nucor Corp. v. United States, 414 F.3d 1331, 1341 (Fed. Cir. 2005) (explaining that the court need not engage in expansive discussion or weigh in on Commerce's formula, the court's task is to determine that statutory requirements have been met)), aff'd, Al Ghurair II, 65 F. 4th at 1351.  Commerce thoroughly explained the basis for its calculations and addressed Deacero's concern that the method inflated the value of imported HCS wire.  See IDM at 20–21.

III.    Commerce reasonably calculated the value of HCS wire under 19 U.S.C. §1677j(a)(1)(D) using constructed value

Deacero contends Commerce unreasonably valued the imported HCS wire by using a constructed value ("CV") in its calculation instead of Deacero's reported sales value.  Deacero Br. at 8–9 (citing Deacero Admin. Br. at 19–22).  Deacero

argues that Commerce's calculation "implicitly inflates" the value of the HCS wire Deacero imports from Mexico, thereby resulting in an improper calculation for the value added by Deacero's processing in the United States.  Id. at 36.

The Government contends that for calculations under sections 781(a)(2)(E) and 781(a)(1)(D) of the Act, "Commerce followed its regulation at 19 C.F.R. § 351.226(h) in deriving the value of merchandise from the cost of production."  Gov. Br. at 22 (citing 19 U.S.C. §§ 1677j(a)(1)(D), (2)(E)).

Under section 781(a)(1)(D) of the Act, Commerce may include imports of parts or components within the scope of an order if the value of the parts and components produced in the foreign country to which the order applies "is a significant portion of the total value of the merchandise sold in the United States."  19 U.S.C. § 1677j(a)(1)(D).  To calculate the value of the HCS wire produced in Mexico, Commerce,

> divided the per-unit value of the HCS wire produced in Mexico by the per-unit, weighted-average value of the PC strand it produced and sold in the United States during the inquiry period (i.e., January 2021 through June 2023).

PDM at 18.  Commerce valued the imported HCS wire using a CV as described in section 773(e) of the Act, and pursuant to 19 C.F.R. § 351.226(h).  Id. (citing 19 U.S.C. § 1677b(e); 19 C.F.R. § 351.226(h)).  Commerce calculated a CV for the HCS wire by adding the value of the Mexican-produced HCS wire used by Deacero USA for PC strand production to Deacero Mexico's "reported costs during the inquiry period for direct materials, direct labor, factory overhead, packing, selling, general and administrative (SG&A), net interest expense, and profit."  Id. at 18.  Commerce

preliminarily determined that the value of the HCS wire produced in Mexico represented a significant portion of the total value of PC strand sold in the United States, which supported an affirmative finding of circumvention.  Id.

In its case brief before Commerce, Deacero argued that Commerce should have used Deacero's declared value for its HCS wire imports rather than a CV because "the Act establishes a preference for using actual sales values where available, instead of CV."  IDM at 22 (quoting Deacero Admin. Br. at 21–22).  Commerce responded in its Final Determination that it only uses actual sales value "when such values are reliable and reflect market value."  Id.  Commerce explained that Mexico's status as a market economy and the affiliation between Deacero USA and its importer, Deacero Mexico, justified using a CV instead of Deacero's self-reported sales value.  Id.

Commerce reasonably determined that the value of the HCS wire represents a significant portion of the total value of PC strand sold in the United States using a CV for Deacero's Mexican-imported HCS wire.  According to section 351.226(h) of Commerce's regulations, the use of CV is discretionary,

> [i]n determining the value of parts or components (including such purchases from another person) under section 781(a)(1)(D) of the Act, or of processing performed (including by another person) under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act.

19 C.F.R. § 351.226(h); see IDM at 22.  Commerce's finding that the cost of production of the HCS wire was higher than Deacero's reported value and the fact that Deacero USA is affiliated with the party it purchases the HCS wire

from (i.e., Deacero Mexico), supports the decision to use a CV. Id.

Accordingly, Commerce reasonably found that the value of the HCS wire

represented a significant percentage of the PC strand sold in the United

States, which in turn, reasonably supported an affirmative final

determination of circumvention. Id. at 23.

## IV. Commerce's patterns of trade analysis is supported by substantial evidence and in accordance with law

Deacero argues Commerce's determination regarding patterns of trade is

arbitrary, unsupported by substantial evidence, and unlawful because Commerce

failed to consider "contrary evidence that undermined its conclusion." Deacero Br.

at 38 (citing Lingyi Chengen Imp. and Exp. Co. v. United States, 391 F. Supp. 3d

1283, 1292 (CIT 2019) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("An agency acted in an arbitrary and

capricious manner if it 'entirely failed to consider an important aspect of the

problem [or] offered an explanation for its decision that runs counter to the evidence

before the agency . . . . '"))). Deacero contends that Commerce arbitrarily selected

inquiry and comparison periods based on petitioners' suggestion, which were

"gerrymandered to ensure Commerce would find an increase in imports." Id. at 38.

Additionally, Deacero argues that Commerce "willfully ignores" "highly material,"

id. at 41, evidence demonstrating that "[w]hat Commerce purports to be an

'increase' in imports is, in fact, a resumption of the normal pattern of trade." Id. at

38. Consequently, Commerce failed to meet its obligation to conduct an impartial

investigation. Deacero Reply at 20.

Deacero acknowledges that neither the statute nor Commerce's regulations mandate a specific timeframe that Commerce must use to evaluate Deacero's imports, nor does the statute bear a scienter requirement. Deacero Br. at 37, 41. In Deacero's view, when there is record evidence suggesting that the changing trade patterns are not a result of circumvention, it is unlawful for Commerce to make an affirmative circumvention determination that only considers data from the petitioners' purposefully narrow timeframe while "summarily dismissing," id. at 39, contradictory evidence that the patterns of trade "are not the result of attempts to circumvent the Order." Id. at 40; see Deacero Reply at 20–22.

According to the Government, Commerce's determination that the increase in HCS wire imports from Mexico supported an affirmative circumvention should be upheld. Gov. Br. at 22. The Government contends Commerce reasonably selected its comparison and inquiry periods based on when petitioners alleged the circumvention to have begun. Id. at 23 (citing IDM at 24). The Government also asserts that the statute does not require Commerce to consider a respondent's intent to circumvent, and thus, Commerce acted reasonably by not considering evidence of the reason motivating Deacero's changing trade patterns. Id. at 22–23.

Defendant-Intervenors reinforce the Government's position contending that "Commerce properly declined to consider the timing of, and reasons for, Deacero's production of PC Strand in the United States as part of its analysis of the patterns of trade." DI Br. at 18.

To determine whether to include parts or components within the scope of an AD/CVD order, Commerce "shall consider" additional factors including "the pattern of trade, including sourcing patterns" and "whether imports into the United States of the parts or components produced in such foreign country have increased after the initiation of the investigation which resulted in the issuance of such order or finding." 19 U.S.C. §§ 1677j(a)(3)(A), (C).

For "pattern of trade, including sourcing patterns," Commerce first reviewed U.S. import statistics provided by petitioners for PC strand imported from Mexico between 2019 and 2022. PDM at 19; 19 U.S.C. § 1677j(a)(3)(A). Commerce found "no imports during the comparison period (*i.e.*, January 2019 through December 2020) and during the inquiry period (*i.e.*, January 2021 through December 2022)"; meanwhile imports of PC strand from the rest of the world increased by 5.08 percent. PDM at 19. Commerce preliminary determined that these findings "[did] not indicate a shift away from Mexican exports to the United States of PC strand," id., and thus weighed against circumvention. Id.

Second, Commerce examined U.S. import statistics provided by petitioners of HCS wire imports and found

> [the quantity of] imports of HCS wire from Mexico into the United States was 9,064 short tons during 2019 and 2020 and 15,148 short tons in 2021 and 2022, which is an increase of 67.1 percent. In contrast, the quantity of U.S. imports of HCS wire from the rest of the world was 30,041 short tons in 2019 and 2020, and 34,598 short tons in 2021 and 2022, an increase of just 15.2 percent.

Id. These import statistics weighed in favor of finding circumvention. Id. Third, Commerce evaluated evidence Deacero submitted regarding the value and volume

of Deacero's PC strand shipments to Mexican, U.S., and third country markets from July 2018 through June 2023.  Id.  Commerce identified a shift in the pattern of trade, which weighed in favor of finding circumvention.  Id.  Commerce found that its analysis under section 781(a)(3)(A) of the Act supported a preliminary affirmative determination of circumvention.  Id.; 19 U.S.C. § 1677j(a)(3)(A).

Next, Commerce considered whether imports of the HCS wire from Mexico to the United States had increased during the inquiry and comparison periods.  PDM at 20; 19 U.S.C. § 1677j(a)(3)(C).  Commerce evaluated the official import statistics provided by petitioners for the value of U.S. imports of HCS wire as well as Deacero USA's purchases of HCS wire during the inquiry and comparison periods.  PDM at 20.  Commerce preliminarily identified an increase in purchases of HCS wire since the Order.  PDM at 20.  Pursuant to section 781(a)(3)(C) of the Act, Commerce's analysis weighed in favor of a preliminary affirmative determination.  Id.; 19 U.S.C. § 1677j(a)(3)(C).

In its Final Determination, Commerce addressed Deacero's concerns that Commerce had arbitrarily selected its inquiry and comparison periods while ignoring record evidence of the "true reason" for the increase in PC strand production following the imposition of the Order ([[                    ]]).   IDM at 24.  With respect to section 781(a)(3)(C) of the Act, Commerce explained that "an inquiry period that accurately reflects the start of the alleged circumvention activity of an AD or CVD order and is after the initiation of the investigation which resulted

in the issuance of such order or finding" satisfies its requirements under section

781(a)(3)(C) of the Act.  Id. (citation modified); 19 U.S.C. § 1677j(a)(3)(C).

Commerce acted reasonably by choosing its inquiry period based on when

petitioners alleged circumvention to have begun and by selecting a comparison

period of equal length.  See Al Ghurair I, 536 F. Supp. 3d at 1380 (affirming

Commerce's use of dates identical in length for inquiry and comparison period

selections for analysis under sections 781(b)(3)(A) and (C) of the Act), aff'd, Al

Ghurair II, 65 F.4th at 1358–59.  In its Final Determination, Commerce provided a

reasonable basis for its selected timeframe explaining that "[d]efined periods of

inquiry and comparison based around when circumvention was most likely to occur

allow Commerce to efficiently conduct a circumvention inquiry and evaluate the

activity that is alleged to constitute circumvention."  IDM at 24.

Deacero's assertion that Commerce unlawfully failed to consider record

evidence that provided context for the import data misstates both the record and

the law.  In its Final Determination, Commerce explained that the evidence is

"immaterial," id., to its analysis because the statute does not require Commerce to

evaluate petitioners' motivations in filing a circumvention request or the reason for

a change in trade patterns.  Id. at 24–25.

Declining to consider the reasons behind changing trade patterns when

considering additional factors under section 781(a)(3) of the Act is consistent with

Commerce's past practice.  In Al Ghurair I, the respondent argued that it made its

initial investment "prior to the initiation of investigations that resulted in the *2016*

*CORE Orders*," therefore demonstrating a lack of intent to circumvent.  Al Ghurair

I, 536 F. Supp. 3d at 1366, aff'd, Al Ghurair II, 65 F.4th at 1359–60.  This court,

nonetheless, upheld Commerce's determination as reasonable, explaining that "the

statute does not provide for consideration of the sequencing of establishment of

operations relative to an AD/CVD order."  Id. at 1369–70.

To demonstrate a lack of intent to circumvent, Deacero points to record

evidence of its own operations' sequencing, including evidence of its U.S. PC strand

production before the circumvention inquiry began.  See Deacero Br. at 41.  Deacero

also highlights that it moved equipment for PC strand production from a facility in

Mexico to the United States in order to resume normal production following a

temporary pause, not because Deacero intended to circumvent the Order.  See id. at

39.  Still, the existence of record evidence that can provide context for shifting trade

patterns does not alter Commerce's analysis under the statute.  Section 781(a)(3) of

the Act requires Commerce to consider, among other things, the patterns of trade,

including sourcing patterns, and whether there has been an increase in imports of

the parts or components, without regard to any underlying motivation or intent.  19

U.S.C. §§ 1677j(a)(3)(A), (C).  Thus, consistent with the statute and past practice,

Commerce reasonably made its affirmative circumvention finding without regard

for the reasons driving Deacero USA's increase in HCS wire imports from Mexico

and in PC strand production during the inquiry period.

## CONCLUSION

For the foregoing reasons, Commerce's Final Determination was reasonable,

supported by substantial evidence, and in accordance with law.  Accordingly, the

court denies plaintiffs' motion for judgment on the agency record and sustains

Commerce's <u>Final Determination</u>.  Judgment will be entered accordingly.

/s/     Joseph A. Laroski, Jr.<br>
Judge

Dated: <u>May 26, 2026</u>
       New York, New York